Opinion
ARONSON, Acting P. J.
— A jury convicted Victor Espudo Ramirez, Jr., and his brother Armando Apolinar Ramirez of first degree murder (Pen. Code, § 187, subd. (a); all further statutory references are to this code) and active participation in a criminal street gang (§ 186.22, subd. (a)). The jury found true a gang special-circumstance allegation on the murder count (§ 190.2, subd. (a)(22)), and also found true a gang enhancement (§ 186.22, subd. (b)) and firearm enhancement (§ 12022.53, subds. (d), (e)) on that count.
Defendants contend the trial court erroneously prevented the jury from considering their self-defense claim by instructing the jury categorically that “[a] person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force.” (CALCRIM No. 3472.) The prosecutor argued repeatedly based on the plain terms of this instruction that even if the jury believed defendants sought to provoke only a fistfight, their bare intent “to use force” as stated in the instruction — even nondeadly fisticuffs — meant they forfeited a claim of imperfect self-defense. We hold the instruction misstated the law. A person who contrives to start a fistfight or provoke a nondeadly quarrel does not thereby “forfeit[] ... his right to live.” (People v. Conkling (1896) 111 Cal. 616, 626 [44 P. 314] (Conkling).) Instead, he may defend himself “even when the defendant set in motion the chain of events that led the victim to attack the defendant.” (People v. Vasquez (2006) 136 Cal.App.4th 1176, 1179-1180 [39 Cal.Rptr.3d 433] (Vasquez))
The trial court sentenced defendants to life in prison without the possibility of parole, plus a term of 25 years to life for the firearm use. Based on the instructional error, we reverse the judgment.
*944 I
FACTUAL BACKGROUND
In January 2009, defendants were members of the street gang known as La Sierra Brown Knights (La Sierra). Armando lived with his mother, her boyfriend, Armando’s sister, his fiancée, and his son. For several months, members of one of La Sierra’s rivals, a street gang known as Tiny Winos, would drive by Armando’s house, flashing gang signs and guns. On two occasions they shot at the house.
On January 27, 2009, Victor called his friend, Steven Arevalos, who was also a member of La Sierra, to try to put an end to the harassment. Arevalos agreed to accompany Victor and Armando, believing they were “just gonna go over there and just confront them and, if anything, we were just gonna fight.” Arevalos agreed to drive but vetoed Armando’s request to bring a gun, even though Arevalos believed their adversaries would be armed. Armando seemed to comply with Arevalos’s request, returning into his home to stash his .38-caliber handgun, but Armando thought better of leaving the gun behind because he knew firsthand the Tiny Winos gang carried weapons, since they had shot up his house. He put the gun in his sweatshirt pocket and returned to Arevalos’s car. He did not set out intending to shoot anyone.
Armando and Victor hoped they could find Mario, a Tiny Winos member who earlier had interceded at Victor’s request to stop the harassment. At that time, Armando and Victor’s mother had been seeing Mario’s uncle, but the pair no longer dated.
Defendants and Arevalos drove to an apartment complex to look for Mario. Instead, they found Ruben Rivera and six or seven other Tiny Winos members in front of the building. Members of the group later acknowledged at trial that defendants asked to no avail for Mario, and that a Tiny Winos gang member may have thrown the first punch.
Other testimony suggested Armando, Victor, and Arevalos confronted the group aggressively, demanding to know, “Do you have a problem with La Sierra,” and issuing the gang challenge, “Where you from?” A fistfight broke out “instaneous[lyj.” The prosecution’s gang expert explained at trial that in a confrontation between members of rival gangs, “[Wjhen they’re asking you where you’re from, they’re specifically asking you what gang you claim, and that’s tihe purpose of it.” The question is known as “hitting up” a rival. The expert testified that in his experience, “[Mjore often than not, when somebody gets hit up by a rival gang member, there’s generally going to be some kind of violence, at the minimum, a fistfight.”
*945 Armando testified that as soon as the fight broke out, Arevalos and Victor were each double-teamed by Tiny Winos assailants. “Two or three” guys were on Victor and Arevalos had “two or three guys on him.” Armando stepped back from the fighting as Rivera walked toward the group. Armando testified “it looked like [Rivera] had something black in his hand,” and as Rivera approached, he raised his hand, holding an object that “looked like a gun.” Armando pulled his gun from his sweatshirt pocket and fatally shot Rivera. The fighting stopped, and defendants and Arevalos sped away in their car. Other than Armando’s testimony, no evidence showed Rivera or any of the other Tiny Winos members had a gun that night. Armando claimed he reacted in self-defense and to defend his companions.
II
DISCUSSION
Defendants contend the trial court’s instructions prevented the jury from considering their self-defense claim, an error the prosecutor compounded by repeated misstatement of the law reflected in those instructions. Under the facts of this case, we agree.
“ ‘ “It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury’s understanding óf the case.” [Citation.]’ ” (People v. Breverman (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) This instructional duty “prevents the ‘strategy, ignorance, or mistakes’ of either party from presenting the jury with an ‘unwarranted all-or-nothing choice,’ encourages ‘a verdict ... no harsher or more lenient than the evidence merits’ [citation], and thus protects the jury’s ‘truth-ascertainment function’ [citation].” (Id. at p. 155, original italics.)
Here, defendants argue the trial court’s instruction on contrived self-defense erroneously directed the jury to conclude a person has no right of self-defense against an adversary’s deadly attack, even if the defendant contrived to provoke a confrontation to use only nondeadly force against the adversary. The trial court instructed the jury with CALCRIM No. 3472, including its title, Right to Self-Defense: May Not Be Contrived. The instruction provided: “A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force.” The instruction made no allowance for an intent to use only nondeadly force and an adversary’s sudden escalation to deadly violence.
*946 The prosecutor highlighted the instruction in closing argument. The prosecutor argued it precluded any claim of self-defense even if defendants only instigated a fistfight. Indeed, the prosecutor acknowledged the evidence reflected a fistfight as defendants’ likely intent: “Nothing about the way that they approached, what they said, what they did, indicated anything but expecting and wanting a fight with the Tiny Winos. [][] I am not saying expecting and wanting murder. I am saying expecting] and wanting a fight.” Invoking the contrived self-defense instruction, however, the prosecutor continued: “But remember, we are talking about are they entitled to self-defense if they went there intending to provoke a fight and use force! And if you find that they did, they are not entitled to that protection.” (Italics added.)
The prosecutor argued the instruction precluded a claim of self-defense in all possible circumstances under the evidence, i.e., whether “one, . . . Ruben Rivera actually had a gun; two, Armando thought Ruben had a gun; or three, the whole Ruben-had-a-gun theory is made up . . . .” The prosecutor acknowledged frankly that Rivera may have had a gun: “[T]o be quite honest, ladies and gentlemen, they [(the Tiny Winos group)] are gangsters. Can we really believe none of them had a gun?” Nevertheless, the prosecutor insisted under CALCRIM No. 3472 that it did not matter. “Was there a gun in Ruben’s hands? I am going to quickly go over the reasons for yes. I am going to quickly go over the reasons for no. But I want to stress, either way, it doesn’t matter. Because [CALCRIM No.] 3472 says a person does not have the right to self-defense if he provokes a fight or a quarrel with the intent to create an excuse to use force.”
Relying on CALCRIM No. 3471, defense counsel argued in closing argument that the lesser charge of manslaughter might apply, but insisted Armando regained a right to defend himself against murder charges if he truly believed Rivera suddenly escalated the fistfight to a gunfight.[1] The prosecutor, however, invoked CALCRIM No. 3472, arguing, “[Y]ou cannot have the principle] to mitigate from murder to voluntary manslaughter . . . when you are the one who created the circumstances to begin with. It makes *947 sense. It’s fair. It’s just. More importantly, it’s the law.” The jury’s copy of the jury instructions reflects that in reaching its verdict, the jury circled CALCRIM No. 3472.
CALCRIM No. 3472 under the facts before the jury did not accurately state governing law. The blanket rule articulated in CALCRIM No. 3472 and reiterated by the prosecutor effectively told the jury, “A person does not have [any\ right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use [any] force.” In effect, the prosecutor and the trial court advised the jury that one who provokes a fistfight forfeits the right of self-defense if the adversary resorts to deadly force. The adversary simply may stab or shoot a person who contrives what he thought would be a shoving match or fisticuffs. According to the prosecutor and the trial court’s instruction: “A person does not have the right to self-defense” in those circumstances.
To the contrary, cases dating to 1896 invalidate jury instructions that wrongly suggest “the party first at fault — the one beginning the affray— absolutely forfeits to the other his right to live . . . .” (Conkling, supra, 111 Cal. at p. 626.) In other words, it is wrong to instruct the jury that: “Having committed the first wrongful act, the plea of self-defense is foreclosed to him, and his life is the penalty, no matter what turn the affray may subsequently take.” (Ibid.) Similarly, for example, imperfect self-defense is available “when the victim’s use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant.” (Vasquez, supra, 136 Cal.App.4th at pp. 1179-1180.)
True, CALCRIM No. 3472 states a correct rule of law in appropriate circumstances. Thus, a victim may respond to an attacker’s initial physical assault with a physical counterassault, and an attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim’s lawful resistance. (See, e.g., Fraguglia v. Sala (1936) 17 Cal.App.2d 738 [62 P.2d 783].) And when a defendant contrives a “deadly” assault (e.g., People v. Hinshaw (1924) 194 Cal. 1, 26 [227 P. 156] (Hinshaw)), there can be no incommensurate or unjustifiable response by the victim: he or she is fully entitled to use deadly force and the defendant has no right to claim self-defense against those deadly measures.
For example, in People v. Enraca (2012) 53 Cal.4th 735 [137 Cal.Rptr.3d 117, 269 P.3d 543] (Enraca), the evidence showed the defendant shot two victims at close range in the back of the head, execution-style. The defendant’s version of events established the victims were entitled to use deadly force to meet his deadly actions, and therefore the trial court did not err in instructing the jury with CALCRIM No. 3472’s antecedent that a *948 defendant who contrives to use force may not claim self-defense. Specifically, the defendant told investigators the first victim (Hernandez) slapped at the defendant’s gun when the defendant pulled Hernandez’s head back, and the defendant shot Hernandez because he thought Hernandez was reaching for a gun in the other victim’s possession. Having shot Hernandez, the defendant also shot the other victim (Gobert) because he believed Gobert was reaching for the same (nonexistent) gun as Hernandez. As the Supreme Court explained, there was nothing unreasonable or unpredictable in the victims’ supposed responses: “Hernandez responded to being pulled up by the hair by an armed assailant, and Gobert acted in resistance to Hernandez being killed.” (Enraca, supra, 53 Cal.4th at p. 760.) Thus, there was no possible error in the trial court’s instruction on contrived self-defense. Simply put, a defendant who assaults his victims with a gun may not set up a valid self-defense claim with evidence he believed the victims also reached for a gun, since they would be justified in meeting deadly force with deadly force. The evidence justified the contrived self-defense instruction there. {Id. at pp. 761-762.)
As noted, the trial court’s sua sponte duty to instruct the jury on the applicable principles of law derives from the facts before it. Here, defendants sought to invoke in other instructions the principle that one who provokes a nondeadly confrontation nevertheless may defend himself or herself against the victim’s unjustified use of deadly force. Both defense counsel in closing argument relied on instructions describing an initial aggressor or mutual combatant’s revived right of self-defense if an opponent in a nondeadly confrontation suddenly resorts to deadly force (CALCRIM No. 3471) and mitigation of murder to voluntary manslaughter where the defendant honestly but mistakenly believes the immediate use of deadly force is necessary to defend himself or others (CALCRIM No. 571).
But the prosecutor in rebuttal emphasized the plain words of CALCRIM No. 3472 precluded these defenses. The prosecutor stated: “And with all due respect to [defense counsel], I completely disagree with how he read to you the law or explained to you the law. And that’s the beauty of it. It’s on paper. Okay. And you cannot have the principle of self-defense — you cannot have the principle to mitigate from murder to voluntary manslaughter, heat of passion or sudden quarrel when you are the one who created that circumstance to begin with.” (Italics added.) The prosecutor emphasized defense counsel “read to you only a certain portion, [CALCRIM No.] 3471 [,] of [the law of] self-defense. But of course I read [CALCRIM No. 3472], which is the one after, and that is you can’t create the situation. Self-defense may not be contrived, actually; is the title of it. And we covered that.” (Italics added.) The prosecutor earlier had summarized her argument using CALCRIM No. 3472 categorically, as follows: “You can’t go looking for trouble and then complain about the trouble that you find. That’s what that instruction says.”
*949 As noted, she explained that whatever defendants claimed occurred, “it doesn’t matter because of that, of [CALCRIM No.] 3472.” Thus, whether “Rivera actually had a gun,” or Armando only “thought Ruben had a gun,” or “the whole Ruben-had-a-gun theory is made up . . . ,” the prosecutor stressed, “[I]t doesn’t matter.” “Because [CALCRIM No.] 3472 says a person does not have the right to self-defense if he provokes a fight or a quarrel with the intent to create an excuse to use force.”
The Attorney General does not address the prosecutor’s misstatement of the law of self-defense, and indeed concedes defendants had a right to defend themselves if the facts were as they claimed. “[F]or example,” as the Attorney General notes, “if Armando instigated a fist fight, and Ruben suddenly responded with a firearm so that Armando could not withdraw from the fight, Armando had the right to defend himself with deadly force.” But “if Armando instigated the fist fight with the intent to create an excuse for him to shoot Ruben, self-defense did not apply.” (Italics added.)
According to the Attorney General, when read together, CALCRIM Nos. 3471 and 3472 preserve this distinction between contriving to provoke a quarrel to use nondeadly force in a fistfight and contriving to provoke a quarrel to use deadly force. Alternatively, the Attorney General argues that any ambiguity in the intersection of CALCRIM Nos. 3471 and 3472 made it defendants’ burden to request a clarifying instruction, and failure to do so forfeits their challenge. (People v. Guiuan (1998) 18 Cal.4th 558, 570 [76 Cal.Rptr.2d 239, 957 P.2d 928].)
The court may not, however, cast upon the parties its responsibility to instruct the jury accurately. It is the trial court’s statutory duty to instruct on the law applicable to the facts of the case (§§ 1093, subd. (f), 1127), including the defendant’s theory of defense (People v. Ponce (1996) 44 Cal.App.4th 1380, 1386 [42 Cal.Rptr.2d 422, 52 Cal.Rptr.2d 422].) The trial court has a sua sponte duty to instruct the jury on an affirmative defense “even in the absence of a request, ‘if it appears the defendant is relying on such a defense,’ ” as here, “ ‘or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant’s theory of the case.’ [Citation.]” (People v. Boyer (2006) 38 Cal.4th 412, 469 [42 Cal.Rptr.3d 677, 133 P.3d 581].) Although no particular jury instructions are required, the court has a duty to ensure that the instructions provide a complete and accurate statement of the law. (People v. Fiu (2008) 165 Cal.App.4th 360, 370 [81 Cal.Rptr.3d 32]; People v. Martinez (1984) 157 Cal.App.3d 660, 667 [203 Cal.Rptr. 833].) Where, as here, the trial court’s failure to properly instruct the jury affects the defendant’s substantial rights, the defendant’s failure to object does not bar the appeal. (§ 1259; People v. Brown (2003) 31 Cal.4th 518, 539, fn. 7 [3 Cal.Rptr.3d 145, 73 P.3d 1137]; People v. Thomas (2013) 218 Cal.App.4th 630, 643 [160 Cal.Rptr.3d 468].)
*950 Here, as the prosecutor repeatedly emphasized to the jury, the plain words of CALCRIM No. 3472 do not support the Attorney General’s attempt to harmonize the instruction with CALCRIM No. 3471. As the prosecutor observed, the discrepancy between the instructions is evident “on paper” in the black-and-white terms of CALCRIM No. 3472. That is, contriving to use any amount of “force” entirely precluded defendants’ self-defense claim, whether Rivera actually drew a gun to escalate the confrontation to deadly force or Armando only thought he did. Nothing in CALCRIM No. 3472 reflected that Armando had to intend to shoot Rivera or use other deadly force against him as a basis for precluding defendants from invoking perfect or imperfect self-defense. Instead, under CALCRIM No. 3472’s plain terms, any “force” sufficed to preclude the defense. As the prosecutor repeatedly emphasized, under CALCRIM No. 3472’s command, “it doesn’t matter” whether under CALCRIM No. 3471 the original victim escalated a nondeadly conflict to deadly proportions. Rather, CALCRIM No. 3472 admits no exceptions in foreclosing self-defense where a defendant contrives to start a quarrel as a pretext to use “force,” whether deadly or nondeadly. The instruction misstates the law.
The Attorney General attempts to draw a vague, unspecified distinction in which CALCRIM Nos. 3471 and 3472 only “pertain to the complete defense of self-defense, not the mitigating defense of imperfect self-defense.” But whatever the value in such a distinction, if any, it does not hold for several reasons. First, the Attorney General does not maintain the distinction, nor did the prosecutor. Specifically, the Attorney General suggests in her briefing that CALCRIM No. 3471 applies only to a so-called complete defense requiring an acquittal “if Armando instigated a fist fight, and Ruben suddenly responded with a firearm.” But two pages later she describes the instruction as equally applicable to “imperfect self-defense if [defendants] provoked [Ruben’s group] with words or punches, and thereafter Ruben escalated from fisticuffs to deadly force . . . .” (Italics added.) As noted, the prosecutor in a different fashion did not maintain the distinction either: she erroneously argued CALCRIM No. 3472 obliterated all forms of self-defense — both perfect and imperfect self-defense alike — if the defendant contrived to use any force.
Second, the Attorney General and the prosecutor are wrong. Contrary to the Attorney General’s attempt to make a distinction in which CALCRIM No. 3471 applies only to complete self-defense, a defendant may claim imperfect self-defense when faced with the original victim’s sudden escalation to deadly force. (People v. Quach (2004) 116 Cal.App.4th 294 [10 Cal.Rptr.3d 196] (Quach); Vasquez, supra, 136 Cal.App.4th at pp. 1179-1180.) Similarly, the prosecutor was wrong to suggest defendants were precluded from asserting a valid self-defense claim of any kind. Though *951 a defendant “set[s] in motion the chain of events that led the victim to attack the defendant,” he or she still may assert a claim of self-defense. (Vasquez, at p. 1180.)
In Vasquez, a wheelchair-bound defendant who had a hidden gun provoked a confrontation with the victim in an alleyway to accuse the victim of molesting the defendant’s younger brother. The victim responded by lunging at the defendant and attempting to choke him, whereupon the defendant shot and killed him. The trial court denied the defendant’s request for an imperfect self-defense instruction, finding as a factual matter the defendant could not have feared for his life since he had a firearm. (Vasquez, supra, 136 Cal.App.4th at pp. 1179-1180.)
Nothing in the record, however, “suggest[ed] appellant was pointing a gun, or that his gun was even visible, when Arechiga [(the victim)] lunged toward him.” (Vasquez, supra, 136 Cal.App.4th at p. 1178, fn. 1.) As the reviewing court explained, “It was for the jury sitting as the trier of fact to decide whether appellant actually feared serious injury or death from being choked.” {Id. at p. 1179.) The Vasquez court observed: “That appellant had a gun to rebuff Arechiga’s attack does not mean appellant could not have believed his life was in peril — in fact, a defendant claiming imperfect self-defense will always have had the means to rebuff the victim’s attack, or else the homicide would not have occurred. In our holding it was the jury’s role to determine appellant’s state of mind, we do not ignore the plentiful evidence suggesting appellant’s criminal intent in the alley.” {Ibid.) The court noted that “a reasonable jury could have concluded that in creating the situation appellant intended to kill all along.” {Id. at p. 1179, fn. 2.) But “[a] reasonable jury could also have concluded that appellant only intended to confront Arechiga with the accusation of rape and it was only after Arechiga attacked him that appellant formed the intent to kill.” {Ibid.)
The Vasquez court explained the trial court and the Attorney General “interpreted imperfect self-defense too narrowly” in suggesting “the defense is not available to a defendant who ‘induces a quarrel that leads to an adversary’s attack.’ ” (Vasquez, supra, 136 Cal.App.4th at p. 1179, italics added.) These italicized words echo the words of CALCRIM No. 3472. But Vasquez explained: “Neither the court nor respondent is precisely correct. Imperfect self-defense does not apply if a defendant’s conduct creates circumstances where the victim is legally justified in resorting to self-defense against the defendant.” {Ibid., original italics.) “But the defense is available when the victim’s use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant.” {Id. at pp. 1179-1180.) Accordingly, the Vasquez court reversed for a retrial.
*952 The same result is required here. While the trial court instructed the jury that a claim of imperfect self-defense reduces murder to the lesser included offense of voluntary manslaughter if the defendant honestly but mistakenly believed deadly force was necessary (CALCRIM No. 571), CALCRIM No. 3472 as given here and as argued by the prosecutor erroneously foreclosed defendants’ imperfect self-defense claim. On the prosecutor’s motion, the trial court instructed the jury with a modified version of the standard imperfect self-defense instruction, CALCRIM No. 571. This “Special Instruction Regarding Wrongful Conduct” told the jury: “The principle of imperfect self-defense may not be invoked by a defendant who, through his own wrongful conduct (e.g., the invitation of a physical assault or the commission of a felony) has created circumstances under which his adversary’s attack or pursuit is legally justified.”
This instruction did nothing to counteract CALCRIM No. 3472’s categorical terms or the prosecutor’s argument that purported to absolutely bar a defendant’s claim of self-defense if he or she contrived to use “force.” To the contrary, the instruction presented an additional reason to preclude defendants’ self-defense claim if the victim used “legally justified” force, but without limiting what was “legally justified” in response to contrived force. Indeed, in light of CALCRIM No. 3472’s absolute terms barring a defendant’s claim of self-defense even if he or she contrived to use only nondeadly force, and given the prosecutor’s forceful argument that “it [did not] matter” whether Rivera was actually armed or Armando believed he or his companions were about to be shot, the jury was misled on the law of self-defense. Rivera was not legally entitled to use deadly force if the jury believed defendants’ claim they only intended to use nondeadly force and presented no deadly threat.
The Attorney General argues Victor forfeited his challenge on appeal by requesting CALCRIM No. 3472. Victor’s trial counsel checked a box for “3472 rt. to self-defense” in his printed form request for jury instructions. Counsel did so apparently without realizing the instruction erroneously stated the law relevant to his defense, precluding his reliance on Armando’s claims of self-defense and defense of others to contest the murder charge. On appeal, Victor correctly observes there is no conceivable tactical reason for requesting an instruction that eliminates one’s defense. Consequently, because he received ineffective assistance of counsel and we cannot say the jury would have rejected defendants’ defense if it had been properly instructed, Victor’s challenge is not forfeited. (Strickland v. Washington (1984) 466 U.S. 668, 684-687 [80 L.Ed.2d 674, 104 S.Ct. 2052]; People v. Mendoza Tello (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)
The Attorney General argues the instructional error was harmless given the jury’s true findings on the gang special circumstance (§ 190.2, subd. (a)(22)) *953 and the gang enhancement (§ 186.22, subd. (b)). The Attorney General suggests that because the jury found defendants intended to kill Ruben to further and promote their gang, any notion of self-defense was explicitly rejected by the jury. The Attorney General’s argument fails, however, precisely because the jury was misled by CALCRIM No. 3472. The jury cannot be said to have rejected defendants’ imperfect self-defense claim where the instructions erroneously required them to reject the claim.
In essence, the instructions and the prosecutor’s argument erroneously required the jury to conclude that in contriving to use force, even to provoke only a fistfight, defendants entirely forfeited any right to self-defense. The instructions and the prosecutor’s argument established as a matter of law that defendants were not entitled to imperfect self-defense if they contrived to use any force, even nondeadly force, but that was a question for the jury to decide on its own evaluation of the facts. (Vasquez, supra, 136 Cal.App.4th at p. 1179, fn. 2; Quach, supra, 116 Cal.App.4th at p. 303 [federal constitutional error in instructions where “[w]e cannot be convinced beyond a reasonable doubt that no jury could have adopted Quach’s version of the facts”].)[2]
Ill
DISPOSITION
The judgment is reversed.
Thompson, J., concurred.

 CALCRIM No. 3471 provides that a person who “engages in mutual combat” or “starts a fight” ordinarily has “a right to self-defense” only if three criteria are met: he actually and in good faith tried to stop fighting; communicated to his opponent “by word or by conduct” this intent to cease fighting; and gave the opponent a chance to stop fighting. As defense counsel explained, these criteria need not be met where the opponent suddenly resorts to deadly force in response to a defendant’s nondeadly attack. CALCRIM No. 3471 provides: “[I]f the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting.”

 Our dissenting colleague concludes CALCRIM No. 3472 as given correctly precludes CALCRIM No. 3471’s lethal escalation defense because a defendant is “notpermitted to assert the right to self-defense if [he] initially engaged in that activity for the purpose of contriving the opportunity to engage in further violence in response to [his] adversary’s reaction.” (Dis. opn., post, at p. 957, italics added.) According to the dissent, this forfeiture under CALCRIM No. 3472 applies “even if [the victim’s lethal escalation] requirements of CALCRIM No. 3471” are met. (Dis. opn., post, at p. 957.) A mutual combatant therefore may end a fistfight with a knife or a bullet, and the defendant who intended only fisticuffs must lay down his life without defending it. The prosecutor adopted this position, but the Attorney General does not, conceding a defendant may defend himself in those circumstances. The dissent’s position is not the law. (Conkling, supra, 111 Cal. at p. 626 [“party first at fault” does not “absolutely forfeit[] to the other his right to live”].) As the dissent recognizes, Enraca is distinguishable because the defendant’s evidence showed only his deadly intent, not a nondeadly confrontation, and as we explained, Hinshaw similarly turned on the defendant’s intent to provoke a “deadly” quarrel. (Hinshaw, supra, 194 Cal. at p. 26.) The dissent and CALCRIM No. 3472 make no distinction between deadly and nondeadly force, nor an opponent’s escalation to deadly force. The distinction makes all the difference. Defendants were entitled to have the jury consider their imperfect self-defense claim.