Filed 3/3/16  P. v. Battaglia CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PATRICIA MARIE BATTAGLIA,<br><br>        Defendant and Appellant. | A143473<br><br>(Contra Costa County<br>Super. Ct. No. 5-130650-5) |

A jury found that defendant Patricia Battaglia struck another woman in the face with a drinking glass during a bar fight and convicted her of assault with a deadly weapon and assault by means of force likely to produce great bodily injury. (Pen. Code, § 245, subds. (a)(1), (a)(4).)[1] For each offense, the jury also found that defendant personally inflicted great bodily injury. (§ 12022.7, subd. (a).) The court suspended imposition of sentence and placed defendant on probation conditioned upon serving 90 days in county jail followed by 90 days in a residential treatment program.

Defendant appeals, contending the court erred when instructing the jury by rejecting jury instructions regarding character evidence and by giving an assertedly erroneous standard jury instruction on self-defense. Alternatively, defendant seeks reversal of one of the assault convictions, noting that one is a lesser included offense of the other. We find no error in the jury instructions but the second point is well-taken, as the Attorney General acknowledges. We shall modify the judgment to vacate the

---

[1] All further section references are to the Penal Code.

1

conviction for assault by means of force likely to produce great bodily injury and, as modified, affirm the judgment.

## Statement of Facts

The March 8, 2013 altercation between defendant and Shanti Azariah at issue here was the culmination of a long-standing conflict between the two women that began years earlier. In 2008, defendant and her children lived for a few weeks in Azariah's in-law unit. The women argued and Azariah changed the lock on the unit to bar defendant's access. Sometime later, Azariah removed defendant's personal property from the premises and put her belongings outside for her to retrieve. Azariah testified that the police advised this method. Defendant claims that Azariah dumped her belongings "on the street" and not everything was returned.

Eight months after defendant moved out, the women encountered each other at Rancho Sports Bar in El Sobrante. According to Azariah, defendant yelled that Azariah "stole her stuff" and hit her arm and she responded by "splash[ing]" her drink on defendant, which led to shoving and hair pulling. Defendant testified that Azariah started the fight by insulting her and raising her glass to "pitch" at her or hit her. A bartender testified that she heard the women arguing and saw Azariah with a raised glass. The bartender broke up the fight. The women saw each other at the Rancho Bar several times over the next five years. The encounters were hostile but not physically violent until March 2013.

Azariah testified that on March 8, 2013, she had been socializing at the Rancho Bar for about 20 minutes when defendant arrived. After making eye contact, defendant went to the pool room and Azariah went to an outside rear patio, where she was speaking with other patrons. Soon after, defendant came to the patio and walked up to Azariah. According to Azariah, defendant put her face within six inches of her face and started yelling that she stole from defendant and was "a piece of shit," "a fucking bitch," and "nothing but a nigger."[2] Defendant threatened to "kick [her] ass." Azariah called

---

[2] Azariah is African-American.

2

defendant a "fucking crazy bitch" and told her to "shut the fuck up" and "go away." Azariah also accused defendant of stealing from her. After five to 10 minutes of this heated exchange, defendant walked back into the bar room.

Azariah testified that she waited a few minutes, hoping defendant had left, and then went from the patio into the bar room. Defendant was still in the bar. Defendant walked up to Azariah and "started to curse [her] out again." Azariah decided to leave and started walking toward the front exit. As Azariah passed through an interior doorway, defendant stepped in front of her, blocking the way, and then used her knee to "nudge" or "hit" Azariah's leg. Azariah stepped back, looked at defendant, then walked forward. Defendant pushed Azariah and she pushed back. Defendant raised her hand overhead and struck Azariah's face with a drinking glass.[3] Azariah did not see the glass in defendant's hand but felt its impact. The glass landed "[e]xtremely hard" and Azariah saw "glass shattering." Azariah was dazed, bleeding and "in a lot of pain." Defendant "aggressively" advanced toward Azariah and Azariah pushed her back. Defendant fell to the floor and grabbed Azariah's leg as she fell, pulling Azariah down with her. Azariah stood up and walked away but defendant came after her. Blood was streaming into Azariah's eye, obstructing her vision. The women pushed and shoved each other several times. To stop defendant, Azariah pulled her by the hair and called for help. A man separated the women and stopped the fight.

The police were called and arrived on the scene. The deputy sheriff who responded to the call testified that Azariah had a two-inch laceration on the left side of her face and was bleeding heavily. The deputy also saw a broken glass on the floor. An ambulance transported Azariah to the hospital. The treating physician testified that Azariah had two lacerations on her face, a smaller one near the temple and a larger one at the cheek bone area. The larger laceration was about three centimeters long and had a

---

[3] Azariah testified it was a pint glass. Merle Snopel, an off-duty bartender who was socializing at the bar, said the glass was a "very thick" "well drink glass" about four inches tall, not a pint glass. But bartender Margaret Prather said it was a pint glass, and was certain because that was the type of glass she was using for drinks that day.

jagged edge. Both lacerations were "rather deep" — muscle and an underlying gland were exposed. Over 20 sutures were required to close the lacerations. Azariah testified that her injuries caused pain for weeks and that her face is scarred.

Several bar patrons and staff members testified as prosecution witnesses. Bar patron Norman Wilcoxson, who was not acquainted with defendant or Azariah, was sitting in the bar less than eight feet from where the women were standing. He testified that he saw them argue and then push and pull each other. He heard defendant say "Let's get it on." Azariah tried to step around defendant, walking toward the front exit, but defendant side-stepped in front of her. Azariah tried to push defendant out of the way but defendant held on to Azariah. There was more pushing and shoving between the women. Defendant made an overhead swing at Azariah and glass fragments flew through the air. The women scuffled for a few minutes until a man broke up the fight. Azariah never threatened defendant or hit her with an object.

Bar patron Merle Snopel did not know who initiated the verbal exchange and did not see if the women pushed and shoved each other as Azariah was walking toward the exit. He did see defendant hit Azariah in the face with a glass. Snopel testified that the strike was unprovoked: Azariah did not threaten defendant or swing at her – the strike "took everybody by surprise."

Bartender Margaret Prather did not see defendant strike Azariah. She did see defendant and Azariah talking then heard a glass break and fall to the floor. Prather saw Azariah with a bleeding cut on her face and witnessed the ensuing tussle. Azariah did not initiate physical contact with defendant or threaten her. Prather testified that defendant "blindsided" Azariah and Azariah reacted "to defend herself."

Defendant testified to a different account of the incident. Defendant admitted an "ugly verbal confrontation" on the patio that continued into the bar room but denied initiating any physical contact with Azariah. Defendant said she and Azariah accidentally bumped into each other in a narrow passage as she was walking toward the patio and Azariah was walking toward the front exit. The women "kind of pushed apart" and Azariah then leaned on the pinball machine and kicked defendant. The kick struck

defendant on the wrist and knocked a glass from her hand. Azariah then "came at" defendant "with both hands" and "rammed" her against the bar. Defendant was "scared" and fought to defend herself. While struggling with Azariah, defendant's head struck her in the face. The women punched each other and most of defendant's blows landed on Azariah's face. Defendant insisted that Azariah started the fight. Defendant said she was "terrified" and thought Azariah was "going to kill" her. Defendant denied striking Azariah in the face with a glass.

Defendant's testimony was consistent with the testimony of two other bar patrons, Todd Gooch and his girlfriend Sandra Coe. Gooch has a "friendly" relationship with defendant – on several occasions, he and defendant played music together "in a jam session." Gooch and Coe testified that they saw defendant and Azariah arguing when they arrived at the bar. The couple had just stepped inside the bar and were about 30 feet away from the women, according to Coe. Coe and Gooch saw Azariah kick defendant. Coe said the kick struck defendant's hand and a glass "went flying up in the air." Azariah then "lunged" at defendant. The women "started to fight" and Coe and Gooch left the bar. They were in the bar less than one minute and left before the police arrived to take statements. Gooch came forward sometime later. He heard that defendant was "in big trouble" and provided a statement to a public defender investigator. At the close of her trial testimony, Coe admitted pleading no contest to misdemeanor theft and burglary charges in 2004, 2007 and 2012.

Two witnesses testified as to defendant's character. Ronald Jones testified that he has known defendant for 20 years and believes her to be "a peaceful person." Michelle Hendrix testified that she has known defendant for over 25 years and believes her to be "very peaceful." A single question was asked of each witness on cross-examination: "Were you at the Rancho Bar on March 8th, 2013?," to which each witness answered no.

The deputy sheriff who took defendant's statement on the night of the bar fight testified on rebuttal. After the incident, defendant told the deputy that Azariah started the fight by kicking her on the shin. According to defendant's prior statement, the women

argued and Azariah grabbed a glass and hit defendant in the head with it. The women then fell to the floor and punched each other.

**Discussion**

1. *Jury instruction on the use of character evidence.*

Defendant contends the trial court erred in refusing to instruct the jury on the use of character evidence. (CALCRIM No. 350.) CALCRIM No. 350 instructs a jury that it may consider evidence as to defendant's character "along with all other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt" and that evidence of defendant's character "can by itself create a reasonable doubt" as to defendant's guilt.

A jury should be instructed on the use of character evidence where evidence of character is admitted at trial and an instruction is requested. (E.g., *People v. Bell* (1875) 49 Cal. 485, 489-490.) Evidence of defendant's character as a "peaceful person" was admitted and, thus, it would have been proper for the trial court to give CALCRIM No. 350 if requested by the defense. However, it is not clear a request was made and refused. Defense counsel included the instruction in her written list of requested instructions but its disposition, whether withdrawn or refused, is not stated on the record. Defense counsel and the prosecutor agreed to discuss their requests for jury instructions off the record and to go on the record later if they had any objections to the instructions approved by the court. No objections were stated to the approved set of instructions, which suggests that defense counsel either withdrew her request for CALCRIM No. 350 or acquiesced in its withdrawal.

Even if we assume CALCRIM No. 350 was requested and refused, there is no prejudice. "We determine the correctness of the jury instructions from the entire charge of the court, not from considering only parts of an instruction or one particular instruction. [Citation.] The absence of an essential element from one instruction may be cured by another instruction or the instructions taken as a whole. [Citation.] Further, in examining the entire charge we assume that jurors are ' " ' "intelligent persons and

6

capable of understanding and correlating all jury instructions which are given." ' " ' "
(*People v. Smith* (2008) 168 Cal.App.4th 7, 13.)

The jury was instructed to consider all of the evidence presented, which necessarily includes the testimony of the character witnesses. The jury was instructed that defendant is presumed innocent and that the People must "prove a defendant guilty beyond a reasonable doubt." (CALCRIM No. 103.) "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial." (*Ibid.*) Evidence was defined to include "the sworn testimony of witnesses" (CALCRIM No. 104) and the jury was specifically instructed to weigh the opinion testimony of lay witnesses.[4] (CALCRIM No. 333.) The instructions, read as a whole, sufficiently informed the jury to consider the character evidence presented.

It is not reasonably probable that the verdict would have been more favorable to defendant had the trial court given CALCRIM No. 350. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Larsen* (2012) 205 Cal.App.4th 810, 830 [*Watson* standard applies where erroneous refusal of jury instruction does not relieve prosecution of burden of proof or remove from jury's consideration essential element of charged offense].) The only character evidence presented was the testimony of two friends of defendant who said they "believe" or "feel" she is a "peaceful" person. That testimony, even if fully credited, does not refute the substantial evidence that on March 8, 2013, defendant engaged in a verbal altercation that escalated into a physical assault of Azariah. Defendant's claim of self-defense was contradicted by several eye-witnesses present at

---

[4] In an instruction requested by the defense, the jury was told: "Witnesses gave their opinions during trial. You may but are not required to accept these opinions as true or correct. You may give the opinions whatever weight you think appropriate. Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion. You must decide whether information on which the witness relied was true and accurate. You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 333.)

the scene — Wilcoxson, Snopel and Prather. The only individuals who lent support to defendant's claim were two individuals, one a friend of the defendant, whose claimed presence at the bar was never corroborated and who, if present at all, had an exceptionally brief and distant view of the fight. Most importantly, defendant's account is wholly inconsistent with the physical evidence of Azariah's injuries. Azariah suffered deep facial lacerations, yet defendant claimed she used only a head-butt and punches to defend herself. Defendant was not prejudiced by any failure to give CALCRIM No. 350.

2. *Jury instruction on the cross-examination of character witnesses.*

Defendant contends the trial court erred in refusing to instruct the jury on the cross-examination of character witnesses. (CALCRIM No. 351.) As with the instruction previously discussed, defendant has failed to provide a record that the instruction was refused. CALCRIM No. 351 appears in defense counsel's written request for instructions but, following an unrecorded conference with the court, counsel made no objection to the final set of instructions and thus appears to have either withdrawn her request for CALCRIM No. 351 or acquiesced in its withdrawal.

In any event, there was no basis for giving the instruction and thus any refusal was proper. CALCRIM No. 351 is a limiting admonition given when the prosecutor cross-examines character witnesses by asking if they have heard that the defendant engaged in certain conduct. (*People v. Hempstead* (1983) 148 Cal.App.3d 949, 954.) This instruction states: "The attorney for the People was allowed to ask defendant's character witness[es] if (he/she/they) had heard that the defendant had engaged in certain conduct. These 'have you heard' questions and their answers are not evidence that the defendant engaged in any such conduct. You may consider these questions and answers only to evaluate the meaning and importance of (the/a) character witness's testimony." (CALCRIM No. 351.) No questions of this nature were asked here. Of each character witness, the prosecutor asked only the single question whether the witness was present at the bar on the date in question, to which each answered no. The prosecutor did not ask the witnesses if they had

heard of defendant's conduct at the Rancho Bar or anywhere else and thus there was no factual predicate for CALCRIM No. 351.

3. *Jury instruction on self-defense.*

Defendant claims the court erred in giving CALCRIM No. 3472, a standard jury instruction on self-defense. The instruction provides, in full: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

As defendant notes, CALCRIM No. 3472 is not properly given in all circumstances. Contrary to the categorical terms stated in the instruction, one *may* have the right to self-defense if one provokes a fight with the intent to create an excuse to use force if one intended to use only nondeadly force and the other party unjustifiably responds with deadly force. (*People v. Ramirez* (2015) 233 Cal.App.4th 940, 948.) "[C]ases dating to 1896 invalidate jury instructions that wrongly suggest 'the party first at fault—the one beginning the affray—absolutely forfeits to the other his right to live. . . .' [Citation.] In other words, it is wrong to instruct the jury that: 'Having committed the first wrongful act, the plea of self-defense is foreclosed to him, and his life is the penalty, no matter what turn the affray may subsequently take.' [Citation.] Similarly, for example, imperfect self-defense is available 'when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant.' " (*Id.* at p. 947.)

None of these circumstances are presented here, so that CALCRIM No. 3472 was properly given. "CALCRIM No. 3472 states a correct rule of law in appropriate circumstances." (*People v. Ramirez, supra,* 233 Cal.App.4th at p. 947.) A "victim may respond to an attacker's initial physical assault with a physical counterassault, and an attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim's lawful resistance." (*Ibid.*) That is the basis for the instruction here, where evidence was presented that defendant initiated both the verbal and physical altercation and Azariah responded with a physical counterassault of pushing

and hair pulling. CALCRIM No. 3472's qualification arises only from its failure to make "allowance for an intent to use only nondeadly force and an adversary's sudden escalation to deadly violence." (*Ramirez, supra,* at p. 945.) That qualification is inapplicable here, where a deadly counterassault was not at issue. The instruction was properly given

4. *Convictions for a greater and lesser offense.*

The jury convicted defendant of assault with a deadly weapon and assault by means of force likely to produce great bodily injury. (§ 245, subds. (a)(1), (a)(4).) The parties are agreed that the latter assault conviction is a lesser included offense of the former and must be reversed."The law prohibits simultaneous convictions for both a greater offense and a lesser offense necessarily included within it, when based on the same conduct. [Citation.] 'When the jury expressly finds defendant guilty of both the greater and lesser offense . . . the conviction of [the greater] offense is controlling, and the conviction of the lesser offense must be reversed.' " (*People v. Milward* (2011) 52 Cal.4th 580, 589.)

Defendant's simultaneous convictions for assault with a deadly weapon and assault by means of force likely to produce great bodily injury cannot stand. Previously, section 245 subdivision (a)(1) "describe[d] two different ways of committing a prohibited assault: (1) by use of a deadly weapon or instrument other than a firearm or (2) by means of force likely to produce great bodily injury." (*People v. Martinez* (2005) 125 Cal.App.4th 1035, 1043.) A single criminal act was not punishable under both forms of assault because it was settled that "[s]ection 245 . . . defines only one offense . . . . The offense of assault by means of force likely to produce great bodily injury is not an offense separate from . . . the offense of assault with a deadly weapon." (*In re Mosley* (1970) 1 Cal.3d 913, 919, fn. 5.) However, section 245 was recently amended, and the two ways of committing an assault split into separate subdivisions. (Stats. 2012, ch. 183, 1 [Assem. Bill No. 1026].) The amendment creates some ambiguity. As amended, section 245 is not clear on its face as to whether the amendment was intended to create separate offenses or

to continue, as had previously been the case, providing different ways of violating section 245.

The legislative history, however, resolves the issue. The stated purpose behind the amendment is efficiency, not a substantive change of law: "AB 1026 will make it easier for prosecutors and defense attorneys to determine whether or not a defendant's prior conviction for assault under Penal Code Section 245(a)(1) involved an assault on a person with a deadly weapon or by any means of force likely to produce great bodily injury. Under California law, an assault with a deadly weapon can be treated more severely than an assault likely to produce great bodily injury." (Sen. Com. on Pub. Safety, Analysis of Assem. Bill No. 1026 (2011–2012 Reg. Sess.) as introduced Feb. 18, 2011, p. 4.) "*AB 1026 does not create any new felonies or expand the punishment for any existing felonies. It merely splits an ambiguous code section into two distinct parts.*" (*Id.* at pp. 4-5, italics added.) The amendment was not intended to create separate offenses and thus defendant cannot be convicted of violating both subdivisions (a)(1) and (a)(4) of section 245. The conviction of the lesser offense must be set aside.

### Disposition

The judgment is modified to vacate the conviction on count two for assault by means of force likely to produce great bodily injury. (§ 245, subd. (a)(4).) As modified, the judgment is affirmed.

11

_____
Pollak, J.


We concur:


_____
McGuiness, P. J.


_____
Jenkins, J.


A143473

12