Filed 12/22/25  P. v. Wilburn CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JONATHAN WILBURN,<br><br>    Defendant and Appellant. | D084186<br><br><br>(Super. Ct. No. SCN389558) |

APPEAL from a judgment of the Superior Court of San Diego County, Kelly C. Mok, Judge.  Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Christopher P. Beesley and Daniel Rogers, Deputy Attorneys General, for Plaintiff and Respondent.

Jonathan Wilburn appeals from a judgment imposed after a jury convicted him of second-degree murder and assault with a firearm.  He contends the trial court erred by giving erroneous jury instructions on his claim of self-defense.  We find no reversible error and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution Evidence*

On the evening of August 3, 2018, Wilburn had a family gathering at his apartment in Carlsbad. The guests included his cousin Anthony McFarlin, McFarlin's girlfriend Alyssa A., and multiple others. Later that night, the group went to a nightclub in San Diego, then returned to Wilburn's apartment around 2:30 or 3:00 a.m., where they continued partying. The group was drinking and using marijuana throughout the night, but no one was arguing or fighting.

Around 4:30 a.m., McFarlin and Alyssa went into the main bedroom to go to sleep. As they were getting ready for bed, Wilburn banged on the door and came "storming" into the bedroom. He was upset and said they could not stay in that bedroom. McFarlin responded, "Well, you know, that's fine. It's dirty anyways." Wilburn then went to the closet and took out a gun. Neither McFarlin nor Alyssa was armed.

Alyssa stood up from the bed when she saw Wilburn had a gun. Wilburn walked up to her and kept repeating, "You think I'm soft. You think I'm soft." Wilburn then fired the gun twice. One shot hit Alyssa just below her left knee. According to Alyssa and one other witness, no one had attacked or threatened Wilburn before the shooting.

Alyssa's cousins took her from the bedroom to the living room. McFarlin and Wilburn also left the bedroom. Wilburn kept jabbing the gun into McFarlin's stomach, pointing it at his chest and head, and saying, "You think I'm soft. You think I'm soft." and "I'll kill you. So I'm soft? So I'm fake?" McFarlin tried to calm Wilburn down.

Alyssa's cousins called 911 and took her outside to wait for the authorities. McFarlin then ran out of the apartment towards Alyssa.

2

Wilburn followed McFarlin out of the apartment, raised his gun, and fired a shot that struck McFarlin in the back of the head and caused him to fall to the ground. No one was fighting with Wilburn or threatening him when he shot McFarlin. Wilburn said, "See, I'm not soft" or "That's what that motherfucker gets." He held the gun over his head in a "boasting" gesture and seemed proud of shooting McFarlin. Wilburn then went back inside his apartment where he remained for five to 10 minutes before police arrived.

One of the five percipient witnesses called by the prosecution, Khayri B., testified to a different version of events preceding the shooting. According to Khayri, Wilburn was being loud and aggressive and banging on the bedroom door. McFarlin opened the door and they "started getting into it." Wilburn ran into the bedroom and then came out into the living room with a gun drawn. He and McFarlin then returned to the bedroom. Wilburn raised the gun and aimed it at McFarlin. Khayri unsuccessfully tried to knock the gun out of Wilburn's hand. In response, Wilburn pushed Khayri into Alyssa, causing her to fall to the ground. Alyssa got up and "charged" at Wilburn. She swung at him once or twice and hit or scratched him. Wilburn then fired the gun several times, and one of the shots hit Alyssa in the leg. Khayri and McFarlin both ran outside. As McFarlin was running away from Wilburn, Khayri saw Wilburn aim his gun and fire it in McFarlin's direction. McFarlin's back was turned to Wilburn.

McFarlin died from a single gunshot wound to the back of his head. Alyssa suffered an injury from the gunshot wound to her leg. Wilburn suffered a gunshot wound to his left foot and scratches on his face and arm. In DNA testing, Wilburn's and McFarlin's DNA was found on swabs taken from underneath Alyssa's fingernails.

3

B. *Defense Evidence*

Wilburn testified on his own behalf.  After the group returned to his apartment from the club, they all hung out in the living room for a while.  McFarlin and Alyssa eventually retired to Wilburn's bedroom.  Wilburn stayed up for another 45 minutes.

When Wilburn eventually got tired and tried to get into his bedroom, the door was locked.  Wilburn knocked on the door for about four minutes before McFarlin finally opened it.  McFarlin was "irritated" and said to Wilburn, "Why the fuck are you knocking on the door?  What the fuck do you want?  I'm trying to sleep with my fucking girl."  Wilburn had never seen McFarlin in such an "aggressive state" and felt intimidated.

McFarlin told Wilburn, "Come outside.  I'll beat your ass.  It's whatever.  You're little to me.  You've always been little to me.  I'll beat your ass."  Wilburn asked McFarlin to leave his apartment.  McFarlin woke Alyssa up and told Wilburn he no longer considered him family, he was going to beat Wilburn up, and Wilburn would regret asking him to leave.

Wilburn was surrounded by McFarlin, Alyssa, and one of Wilburn's cousins (Khayri B.) who was "pumping up the situation" and seemed to be on McFarlin's side.  Wilburn felt scared they "might jump" him, so he walked into his room and retrieved a Glock handgun from his dresser.  He walked out of his room with the gun pointed at his feet and told McFarlin, Alyssa, and Khayri to leave.

Khayri lunged at Wilburn and tried to take the gun from his hand.  Wilburn pushed him away.  Khayri fell into Alyssa and knocked her down.  Alyssa then got up and charged at Wilburn.  She scratched his back, arms, and shoulders.  Wilburn was afraid she was going to take his gun.  He began

4

to backpedal and fired three "warning shots" towards the ground. One of the shots hit his own foot and another hit Alyssa.

After Alyssa was shot, chaos ensued. McFarlin, his brother, and Khayri confronted Wilburn. They pushed him and shoved him and tried to get his gun. During the struggle, furniture was overturned and the television damaged. Wilburn was afraid his life would be over if they got his gun.

McFarlin pushed Wilburn in the kitchen, causing him to hit his head on the wall. The fight between Wilburn and the other three men continued and moved towards the front door. The other men repeatedly reached for his gun. McFarlin then yelled, "I'm going to get a fucking gun and kill you." Wilburn was in fear for his life. He believed McFarlin was going to retrieve a gun from his car and kill him. As McFarlin turned and began to leave, Wilburn raised his gun and shot him in the back of the head from a distance of four to five feet.

After the shooting, Wilburn gave his gun to another guest and waited in his room until police arrived. He surrendered to the police and agreed to talk to them. When Wilburn told the officers what happened, he did not mention that McFarlin had threatened to get a gun and kill him. As he was being escorted to a patrol car after his arrest, Wilburn said he wanted McFarlin to leave his apartment, and he had shot McFarlin in self-defense because "they kept coming forward to him."

C. *Trial and Sentencing*

In a jury trial, the jury found Wilburn not guilty of first degree murder, but guilty of second degree murder (Pen. Code,[1] § 187, subd. (a)) and assault with a firearm (§ 245, subd. (a)(2)). The jury also found that Wilburn personally used a firearm (§ 12022.5, subd. (a)), personally discharged a

---

[1]    All further statutory references are to the Penal Code.

5

firearm causing death (§ 12022.53, subd. (d)), and personally inflicted great bodily injury upon Alyssa (§ 12022.7, subd. (a)). The court sentenced Wilburn to 40 years to life in state prison.

DISCUSSION

I

Wilburn first argues the trial court committed reversible error by giving CALCRIM No. 3472 on contrived self-defense as follows: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Wilburn objected to this instruction at trial but did not request that the court give any further clarifying instruction. On appeal, Wilburn contends the instruction incorrectly stated that he was categorically prohibited from claiming self-defense even if he provoked a fight with the intent to use only non-deadly force.

We disagree. Under controlling case law, the instruction as given was a correct statement of California law. (*People v. Enraca* (2012) 53 Cal.4th 735, 761 [approving materially identical CALJIC analog to CALCRIM No. 3472]; *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1333–1334 (*Eulian*) [holding that CALCRIM No. 3472 was "a correct statement of law" under *Enraca*].)

In *Eulian*, the trial court gave the same instruction and the Court of Appeal concluded: "The instruction is a correct statement of law." (*Eulian, supra*, 247 Cal.App.4th at p. 1334.) However, the court acknowledged that under the holding of *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*), CALCRIM No. 3472 "might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." (*Eulian*, at p. 1334.) Accordingly, CALCRIM

6

No. 3472 has since been modified (effective September 2022) to add a bracketed second sentence for use in appropriate cases as follows: "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to stop fighting." (CALCRIM No. 3472.)

Because the first sentence of CALCRIM No. 3472 is a correct statement of law, and Wilburn did not request that the second bracketed sentence be given, he has forfeited any claim that the instruction as given was too general or incomplete without modification. "The long-standing general rule is that the failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellate claim of error based upon the instruction given." (*People v. Rundle* (2008) 43 Cal.4th 76, 151.) " 'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 671.)

Wilburn contends that his case is similar to *Ramirez*, in which a divided panel concluded that CALCRIM No. 3472 and the prosecutor's arguments prejudicially misstated the law as applied to the particular circumstances of the case. In *Ramirez*, there was evidence that the defendants confronted rival gang members intending to start a fight, but not to shoot or kill anyone. (*Ramirez, supra*, 233 Cal.App.4th at p. 944.) One of the defendants (Armando) testified that after a fistfight broke out, one of the rival gang members (Rivera) raised his hand holding an object that looked like a gun. Armando then pulled his own gun from his sweatshirt pocket and fatally shot Rivera. (*Id*. at p. 945.)

7

At trial, the defense argued that because Armando's group started the fight intending to use only non-deadly force, and Rivera responded with sudden and deadly force, Armando still had a right to use deadly force in self-defense. (*Ramirez, supra*, 233 Cal.App.4th at p. 948.) But in response, the prosecutor repeatedly invoked CALCRIM No. 3472 to argue to the jury that the defendants had forfeited *any* right of self-defense (perfect or imperfect) if they were the initial aggressors, *even if* they only intended to provoke a fistfight. (*Ramirez*, at pp. 943, 946, 948–949, 950.) In other words, the prosecutor argued that "contriving to use any amount of 'force' entirely precluded defendants' self-defense claim, whether Rivera actually drew a gun to escalate the confrontation to deadly force or Armando only thought he did." (*Id.* at p. 950.) The prosecutor repeatedly told the jury that, under CALCRIM No. 3472, "it doesn't matter" whether Rivera escalated a non-deadly conflict to deadly proportions. (*Ibid.*) She "erroneously argued CALCRIM No. 3472 obliterated all forms of self-defense—both perfect and imperfect self-defense alike—if the defendant contrived to use any force." (*Ibid.*)

Although the *Ramirez* court acknowledged that "CALCRIM No. 3472 states a correct rule of law in appropriate circumstances" (*Ramirez, supra*, 233 Cal.App.4th at p. 947), the majority nevertheless concluded that "CALCRIM No. 3472 as given here and as argued by the prosecutor erroneously foreclosed defendants' imperfect self-defense claim." (*Id.* at p. 952.) "In essence, the instructions and the prosecutor's argument erroneously required the jury to conclude that in contriving to use force, even to provoke only a fistfight, defendants entirely forfeited any right to self-defense." (*Id.* at p. 953.)

We find *Ramirez* to be distinguishable. In contrast to *Ramirez*, the jury here could not have understood anything the prosecutor said as an argument

8

that Wilburn forfeited the right of self-defense if he contrived to use *any* amount of force, even non-deadly force. Rather, the prosecutor argued that Wilburn's use of force was unreasonable and disproportionate to any threat and that the others had a right to act in self-defense to prevent themselves from being shot after he pulled out the gun. Moreover, even if any of the prosecutor's arguments could be construed to suggest that Wilburn had no right of self-defense if he contrived to use only non-deadly force, Wilburn did not object and has therefore forfeited any claim that the prosecutor misstated the law. (*People v. Centeno* (2014) 60 Cal.4th 659, 674.)

Finally, even assuming any error in giving CALCRIM No. 3472 without the second bracketed sentence, we would find it to be harmless on this record. The undisputed evidence established that Wilburn himself introduced the threat of deadly force into the family gathering by pulling out a loaded gun in a verbal squabble over who was going to sleep in the main bedroom. Having done so, Wilburn could not reasonably claim he was acting in self-defense because of the way the others responded to his own threat of deadly force. Although the jury could have concluded that Alyssa responded to his threat of deadly force by charging at Wilburn and scratching him with her fingernails, no reasonable juror would have found it was reasonable for Wilburn to react by firing his gun inside the bedroom or that Alyssa's or anyone else's conduct justified his subsequent actions in shooting McFarlin in the back of the head outside as he was fleeing. Moreover, to the extent Wilburn testified at trial that McFarlin made a threat to "get a fucking gun and kill [him]," no other witness corroborated this testimony, Wilburn made no mention of it in his own statement to the police, and this would not have constituted a threat of *imminent* harm when McFarlin was at the time unarmed and running away from Wilburn. On this record, therefore, no reasonable juror would have

9

reached a different verdict on a theory that Wilburn contrived to use only non-deadly force and McFarlin or anyone else responded by escalating the situation into one requiring him to use deadly force.

It is especially improbable that CALCRIM No. 3472 contributed to the jury's verdict because there was no evidence that Wilburn "provoke[d] a fight or quarrel *with the intent to create an excuse to use force*." (Italics added.) Wilburn himself did not testify that he provoked the fight with such a contrived intent. Notably, the court instructed the jury: "Some of these instructions may not apply depending on your findings about the facts of the case. Do not assume, just because I give a particular instruction, that I am suggesting anything about the facts." Giving an irrelevant or inapplicable instruction is generally harmless error. (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

In these circumstances, any error in giving only the first sentence of CALCRIM No. 3472 without modification would be harmless under either the *Watson* standard for state-law error or the *Chapman* standard for federal constitutional error. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

II

Wilburn next argues that the trial court erred by giving CALCRIM No. 3471 over his objection that it did not apply to the facts of the case. Wilburn claims this instruction "applies only when the defendant starts a physical fight with the victim, or when the victim and defendant mutually agree to engage in a physical fight."

We conclude substantial evidence supported the instruction. (See *People v. Ibarra* (2024) 106 Cal.App.5th 1070, 1077 ["we determine independently whether substantial evidence supported the instruction"].)

10

CALCRIM No. 3471 provides in relevant part:

> "A person who engages in mutual combat or who starts a fight has a right to self-defense only if:
>
> "1. He actually and in good faith tried to stop fighting;
>
> "AND
>
> "2. He indicated, by word or conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;
>
> "AND
>
> "He gave his opponent a chance to stop fighting.
>
> "If the person meets these requirements, they then had a right to self-defense if the opponent continued to fight."

Although we agree with Wilburn that there was no evidence of mutual combat, there was substantial evidence that he started the fight by initiating the confrontation with McFarlin and Alyssa in the bedroom, arming himself with a loaded gun, pointing the gun at McFarlin, and firing shots that hit Alyssa and himself. Contrary to Wilburn's suggestion, the principle of law set forth in CALCRIM No. 3471 is not limited to situations in which the defendant starts a physical fight by initiating an exchange of blows. " 'If the defendant *in any way* challenged the fight, and went to it armed, he cannot afterward maintain that in taking his assailant's life he acted in self defense. A man has not . . . the right to provoke a quarrel and take advantage of it, and then justify the homicide.' " (*People v. Holt* (1944) 25 Cal.2d 59, 66, italics added.) In *Holt*, for example, the court found the defendant provoked the fight "in that by his quarrelsome and challenging attitude, not only toward deceased but others in touch with him a short time prior to the

11

homicide, he had created an atmosphere of antagonism that might naturally lead to physical combat if he continued, as he did, in this quarrelsome pursuit of trouble." (*Id.* at p. 67; see also *People v. Bolton* (1979) 23 Cal.3d 208, 215 [defendant was initial aggressor because he pointed gun at victim who posed no immediate threat, and when victim appeared to be reaching for a gun in response, defendant "as the aggressor was bound to retreat and not to stand his ground"].)

We therefore find no error in the trial court's decision to give CALCRIM No. 3471. Having rejected Wilburn's only two arguments, we also find no cumulative error.

DISPOSITION

The judgment is affirmed.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.

12