Filed 3/9/23  P. v. Medina CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080110 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD289362) |
| CHRISTINA MEDINA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Dwayne K. Moring, Judge.  Affirmed.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, James M. Toohey and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

Christina Medina appeals from a judgment entered after a jury convicted her of premeditated attempted murder (Pen. Code, §§ 664/187,

189)[1] and shooting at an occupied motor vehicle (§ 246).  She argues that: (1) the trial court committed reversible error by instructing the jury with a modified version of CALCRIM No. 604 on imperfect self-defense and with CALCRIM No. 3472 on perfect self-defense; and (2) the 25-to-life firearm enhancements imposed by the trial court are subject to mandatory dismissal under section 1385, subdivision (c)(2)(C), because they resulted in a sentence over 20 years.  We find no reversible error and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Shooting*

Medina dated the victim Sean P. in 2020.  At some point, they briefly lived together and were engaged, but broke up in December 2020.  According to Medina, Sean was physically and verbally abusive during their relationship, including two incidents of domestic violence she reported to the police.  Another former girlfriend of Sean's also testified that he was physically abusive during their two-year relationship.

In March 2021, Medina believed that Sean owed her $1,000.  Medina repeatedly texted him demanding that he pay her "the rack," a slang term for $1,000.

On the evening of March 8, 2021, Medina and Sean arranged to meet at a park in Imperial Beach.  Around 8:30 p.m., Sean drove there with two friends, V.R. and A.G.  Sean got out of his car and walked to where Medina was standing alone nearby.  They gesticulated and argued with each other about the money, but neither made any aggressive movements.  According to Medina, Sean agreed to go to Bank of America to get the money.  Sean and Medina walked back to Sean's car together, where Sean told his friends that Medina was going to ride with them to Bank of America.  At that point,

---

[1]    All further statutory references are to the Penal Code.

however, Medina's son Francisco Garcia arrived in his car. Medina got in Garcia's car and followed Sean to Bank of America.

At the bank, Medina and Sean got out of their cars and walked to the ATM. According to Medina, Sean tried to withdraw money, but there were insufficient funds in his account. Sean showed her that he had less than $10 in the account. Medina became angry and told Sean to ask his friends for the money.

Sean went back to his car and sat in the driver's seat. Medina stood outside the open driver's seat door. She demanded that Sean give her the $1,000 she claimed she was owed. Sean said he did not have $1,000, but gave her some money, possibly around $100, and told her he had no more.

Medina grabbed the steering wheel of Sean's car. She told Sean and his friends to get out and said she was going to take the car as collateral. Sean told her she could not have the car because it belonged to his mother. Medina told Sean to call his mother so that she could talk to her. Sean made the call around 9:00 p.m.

Around the same time, Medina's son Garcia walked up to the passenger side of Sean's car, opened the passenger door, and threatened to beat up A.G. if Sean did not give Medina the money she demanded. A.G. was scared. Sean told Garcia not to hurt A.G.

Before Sean could say much to his mother on the phone, Medina pulled a handgun from her waistband and pointed it at Sean's face. She pulled the trigger. There was a clicking noise, but nothing happened, likely because there was no round in the chamber. Medina then pulled back the slide, chambered a round, pointed the gun at Sean's face again, and pulled the trigger a second time. The gun discharged, striking Sean in the mouth or neck. Medina then walked back to her car and drove away with her son.

3

According to the passengers in Sean's vehicle, neither they nor Sean made any threats before the shooting. Sean did not make any aggressive movements towards Medina and did not have any weapons. When Medina pulled the gun, Sean was just sitting in the car.

The shooting was captured on the bank's video surveillance. The videotape was played for the jury at trial. Though blurry, it did not depict Sean making any furtive movements or Medina appearing to be startled or surprised before the shooting. The videotape showed that Medina blocked Sean from shutting his driver's door about a minute before the shooting. It also showed Medina standing outside Sean's car and pointing the gun at him for nine seconds from 9:12:51 p.m. to 9:13 p.m., racking the slide at 9:13 p.m., then pointing the gun at him again and shooting him at 9:13:08 p.m.

Sean and his friends drove to the hospital immediately after the shooting. Sean suffered a gunshot wound to his mouth, tongue, and left middle finger. He survived but had to have extensive reconstructive surgery. On multiple occasions after the shooting, he suffered convulsions and temporarily lost the ability to speak. The last time this occurred was a few weeks before trial during a meeting with the prosecutor. Sean did not testify at trial because his doctor believed it could trigger another seizure.

The police recovered a 9-millimeter bullet casing and a tooth from the Bank of America parking lot. In Sean's car, there was blood on the steering wheel and driver's side floorboard, and bone or tooth fragments on both front floorboards. There were no weapons in the car, but there was a baseball bat in the back seat. The police also recovered two cell phones, a wallet with no money, and a folding knife from Sean's clothing at the hospital.

4

The police arrested Medina and her son at their apartment the next morning.  They never found the handgun or clothing worn by Medina at the time of the shooting.

B.    *Medina's Testimony*

Medina testified on her own behalf.  In early March 2021, she had liposuction and her brother died.  She began taking oxycodone for pain and trazodone for insomnia.  She believed that the drugs affected her brain function.  Around the same time, she discovered that someone had borrowed money from a lending agency using her personal information, and the amount owed was $1,000.  She thought that Sean was responsible for the fraud.

On the day of the shooting, Medina texted Sean and they agreed to meet.  Sean told Medina that he was bringing a "homie" with him.  Medina interpreted this to mean that Sean was "bringing backup," so she brought her gun to protect herself and placed it inside her clothing.

At their initial meeting at the park, Medina confronted Sean about the fraud and asked him to give her at least half the money owed.  Sean gave her $60 or $65 and agreed to go to the Bank of America to get the rest.  Medina did not want to ride with Sean because she was scared and uncomfortable.  She rode with Garcia instead.

At the bank, Medina became angry after Sean tried to withdraw money from the ATM and the insufficient funds message appeared.  She told him to ask his friends for money and then demanded his car as collateral.  After Sean said the car belonged to his mother, Medina demanded that he call his mother to verify that the car was hers.  Sean called his mother from inside his car, but then he only said, "Mom, mom, mom" and hung up.  This further

5

angered Medina because she believed that Sean was lying about the car ownership.

Medina's son Garcia was standing at the passenger side of Sean's car. He told the front passenger, A.G., to pay Medina or they would take the car. He demanded that A.G. get out of the car and told Sean, "If you don't pay up, I'm going to beat up your homie." According to Medina, Sean laughed and said, "You're not going to do nothing" and "I'm going to pop you," which is slang for "I'll shoot you." Garcia told Sean, "do it now."

According to Medina, she saw Sean "going for something that to me looked like a gun." She saw a handgun and a nail filer near the gear shift between the front seats. She thought that Sean was going to shoot her son and then shoot her.

Medina pulled out her gun. She racked the slide, pointed the gun at Sean, and pulled the trigger. According to Medina, she only pulled the trigger once, and the gun fired.

After the shooting, Medina walked back to Garcia's car and placed the gun on the floorboard. Garcia drove her home. She took a shower and disposed of her clothing because she was too weak to do laundry. She did not call the police or tell anyone else about the shooting that night.

C.    *Trial Court Proceedings*

A jury convicted Medina of premeditated attempted murder (§§ 664/187, 189) and shooting at an occupied motor vehicle (§ 246). The jury also found true multiple firearm enhancements associated with both counts. (§ 12022.53, subds. (b), (c) & (d).)

The trial court sentenced Medina to seven years to life for the premeditated attempted murder, plus 25 years to life for the associated firearm use enhancement under section 12022.53, subdivision (d). The court

6

imposed a concurrent term of five years for the shooting at an occupied motor vehicle, plus 25 years to life for the associated firearm use enhancement under section 12022.53, subdivision (d). The court imposed and stayed punishment for the lesser firearm enhancements.

DISCUSSION

I

Medina first contends that the trial court committed reversible error by instructing the jury with a modified version of CALCRIM No. 604 on imperfect self-defense and with CALCRIM No. 3472 on perfect self-defense. We address each of these instructions separately applying a *de novo* standard of review. (*People v. Posey* (2004) 32 Cal.4th 193, 218 [*de novo* standard of review for claims of instructional error].)

A.    *Modified Version of CALCRIM No. 604*

The trial court gave CALCRIM No. 604 on attempted voluntary manslaughter committed with an unreasonable belief in the need for self-defense or defense of another (known as imperfect self-defense). At the prosecution's request, however, the court modified this instruction by adding the following sentence taken from CALCRIM No. 571 on voluntary manslaughter: "Imperfect self-defense does not apply when the defendant, through her own wrongful conduct, has created circumstances that justify her adversary's use of force." Defense counsel objected to this modification.

We see no error. The modification is a correct statement of settled law. (*People v. Enraca* (2012) 53 Cal.4th 735, 761 (*Enraca*); *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) Even Medina concedes in her opening brief that "[i]n general, self-defense and imperfect self-defense cannot be invoked where a defendant, by her own wrongful conduct, creates the circumstances in which the adversary's attack is legally justified."

7

Medina nevertheless asserts error based on the holding of *People v. Vasquez* (2006) 136 Cal.App.4th 1176 (*Vasquez*).  There, the trial court refused to give *any* instruction on imperfect self-defense—on the ground that the defendant had induced the quarrel by luring the victim into an alley to confront him.  In reversing, the Court of Appeal stated the relevant law as follows:  "Imperfect self-defense does not apply if a defendant's conduct creates circumstances where the victim is *legally* justified in resorting to self-defense against the defendant.  [Citation.]  But the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant."  (*Id*. at pp. 1179–1180.)  Because there was evidence at trial that "the victims, not the defendants, used unlawful force first," the court concluded that an imperfect self-defense instruction should have been given.  (*Id*. at p. 1180; see also *People v. Randle* (2005) 35 Cal.4th 987, 1001–1003 [defendant entitled to instruction on imperfect self-defense even though he set in motion the series of events leading to the shooting, because victim's use of force was legally unjustified].)

In contrast to *Vasquez*, the trial court here gave a jury instruction on imperfect self-defense.  Moreover, the trial court's modification to CALCRIM No. 604 was consistent with *Vasquez*.  It did not state that imperfect self-defense is unavailable whenever the defendant is the initial aggressor or sets in motion the chain of events leading to a killing.  It merely stated that imperfect self-defense does not apply when the defendant "has created circumstances that *justify* her adversary's use of force."  In other words, the modification correctly stated that a defendant cannot engage in threatening conduct that legally justifies her victim's use of force, then invoke the victim's

8

justifiable force as a basis for claiming imperfect self-defense. This is exactly what *Vasquez* held. (*Vasquez, supra,* 136 Cal.App.4th at pp. 1179–1180.)

To the extent Medina is suggesting that the prosecutor misstated the law in arguing this point to the jury, she has forfeited the claim by failing to object to the prosecutor's argument on this basis at trial and failing to request an admonition or curative instruction. (See *People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*) [prosecutor's misstatement of burden of proof in closing argument "was forfeited" by defendant's failure to object because "[a] prosecutor's misstatements of law are generally curable by an admonition from the court"].) Thus, we conclude that Medina has failed to demonstrate any error arising from the trial court's modification of CALCRIM No. 604 on imperfect self-defense.

B.      *CALCRIM No. 3472*

Medina also argues that the trial court committed reversible error by giving CALCRIM No. 3472 on contrived self-defense as follows: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Medina objected to this instruction at trial but did not request that the court give any further clarifying instruction.

Once again, this instruction as given by the trial court is a correct statement of California law. (*Enraca, supra,* 53 Cal.4th at p. 761 [approving materially identical CALJIC analog to CALCRIM No. 3472]; *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1333–1334 (*Eulian*) [holding that CALCRIM No. 3472 is "a correct statement of law" under *Enraca*].)

In *Eulian*, the trial court gave the same instruction and the Court of Appeal concluded: "The instruction is a correct statement of law." (*Eulian, supra,* 247 Cal.App.4th at p. 1334.) However, the court acknowledged that

9

under the holding of *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*), CALCRIM No. 3472 "might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." (*Eulian*, at p. 1334.) Accordingly, CALCRIM No. 3472 has now been modified (effective September 2022, after Medina's trial) to add a bracketed second sentence for use only in such cases as follows: "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to stop fighting." (CALCRIM No. 3472.)

Because the first sentence of CALCRIM No. 3472 is a correct statement of law, and Medina did not request any amplifying or clarifying instruction, she has forfeited any claim that the instruction as given was erroneous without modification. "The long-standing general rule is that the failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellate claim of error based upon the instruction given." (*People v. Rundle* (2008) 43 Cal.4th 76, 151.) " 'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 671.)

Medina contends that her case is similar to *Ramirez*, in which a divided panel concluded that CALCRIM No. 3472 and the prosecutor's arguments prejudicially misstated the law as applied to the particular circumstances of the case. In *Ramirez*, there was evidence that the defendants confronted rival gang members intending to start a fight, but not to shoot or kill anyone.

10

(*Ramirez*, *supra*, 233 Cal.App.4th at p. 944.)  One of the defendants (Armando) testified that after a fistfight broke out, one of the rival gang members (Rivera) raised his hand holding an object that looked like a gun. Armando then pulled his own gun from his sweatshirt pocket and fatally shot Rivera.  (*Id*. at p. 945.)

At trial, the defense argued that because Armando's group started the fight intending to use only non-deadly force, and Rivera responded with sudden and deadly force, Armando still had a right to use deadly force in self-defense.  (*Ramirez*, *supra*, 233 Cal.App.4th at p. 948.)  But in response, the prosecutor repeatedly invoked CALCRIM No. 3472 to argue to the jury that the defendants had forfeited *any* right of self-defense (perfect or imperfect) if they were the initial aggressors, *even if* they only intended to provoke a fistfight.  (*Ramirez*, at pp. 943, 946, 948–949, 950.)  In other words, the prosecutor argued that "contriving to use any amount of 'force' entirely precluded defendants' self-defense claim, whether Rivera actually drew a gun to escalate the confrontation to deadly force or Armando only thought he did." (*Id*. at p. 950.)  The prosecutor repeatedly told the jury that, under CALCRIM No. 3472, "it doesn't matter" whether Rivera escalated a non-deadly conflict to deadly proportions.  (*Ibid*.)  She "erroneously argued CALCRIM No. 3472 obliterated all forms of self-defense—both perfect and imperfect self-defense alike—if the defendant contrived to use any force."  (*Ibid*.)

Although the *Ramirez* court acknowledged that "CALCRIM No. 3472 states a correct rule of law in appropriate circumstances" (*Ramirez*, *supra*, 233 Cal.App.4th at p. 947), the majority nevertheless concluded that "CALCRIM No. 3472 as given here and as argued by the prosecutor erroneously foreclosed defendants' imperfect self-defense claim."  (*Id*. at p. 952.)  "In essence, the instructions and the prosecutor's argument

11

erroneously required the jury to conclude that in contriving to use force, even to provoke only a fistfight, defendants entirely forfeited any right to self-defense." (*Id.* at p. 953.)

We find *Ramirez* to be distinguishable. In contrast to *Ramirez*, the jury here could not have understood anything the prosecutor said as an argument that Medina forfeited any right of self-defense if she or her son contrived to use *any* amount of force, even non-deadly force. Rather, the prosecutor argued that Medina was the one who initiated the threat of deadly force by pulling out a gun, pointing it at Sean, pulling the trigger, racking the slide, then pulling the trigger again and shooting Sean in the face because she was angry. He also argued that it was simply not credible that Sean reached for a weapon, as Medina claimed. Moreover, even if any of the prosecutor's arguments could be construed to suggest that Medina had no right of self-defense if she or her son contrived to use only non-deadly force, Medina did not object and has therefore forfeited any claim that the prosecutor misstated the law. (*Centeno*, *supra*, 60 Cal.4th at p. 674.)

Even assuming any error in giving CALCRIM No. 3472 without modification, we would find it to be harmless on this record. The evidence is undisputed that Medina and her son were the initial aggressors who demanded money from Sean and tried to take his car. The only evidence that Sean responded by threatening to shoot them or reaching for a weapon was Medina's uncorroborated trial testimony, which was contradicted by the testimony of other witnesses and the surveillance videotape. Defense counsel argued both perfect and imperfect self-defense to the jury based on Medina's testimony, as well as a heat of passion theory of attempted voluntary manslaughter. Yet the jury rejected *all* these defense theories *and* found the attempted murder to be premeditated. The jury reached this verdict even

12

though the trial court instructed it with CALCRIM No. 3471, which stated in relevant part that "if the defendant used only non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend herself or another with deadly force and was not required to try to stop fighting . . . ." Thus, the jury by its verdict necessarily rejected Medina's version of events.

Finally, it is improbable that CALCRIM No. 3472 contributed to the jury's verdict because there was no evidence that Medina "provoke[d] a fight or quarrel *with the intent to create an excuse to use force*." (Italics added.) The evidence established that Medina provoked a fight or quarrel with the intent to get money from Sean, not to manufacture a contrived excuse to use force against him. Notably, the court instructed the jury: "Some of these instructions may not apply depending on your findings about the facts of the case. Do not assume, just because I give a particular instruction, that I am suggesting anything about the facts." Giving an irrelevant or inapplicable instruction is generally harmless error. (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

In these circumstances, any error in giving CALCRIM No. 3472 would be harmless under either the *Watson* standard for state-law error or the *Chapman* standard for federal constitutional error. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

## II

Medina next argues that the 25-to-life firearm enhancements imposed for counts one and two are unauthorized. She contends that these enhancements are subject to mandatory dismissal under section 1385,

13

subdivision (c)(2)(C), because they resulted in a sentence over 20 years. We disagree.

"For all criminal sentencing after January 1, 2022, our Legislature in Senate Bill No. 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1) has provided direction on how trial courts are to exercise their discretion in deciding whether to dismiss sentencing enhancements." (*People v. Walker* (2022) 86 Cal.App.5th 386, 391 (*Walker*).) Specifically, section 1385, subdivision (c)(1) now provides that "the court shall dismiss an enhancement if it is in the furtherance of justice to do so," and subdivision (c)(2) states that "[i]n exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence" of nine listed "mitigating circumstances," any one of which "weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." Subdivision (c)(3) further provides: "While the court may exercise its discretion at sentencing, this subdivision does not prevent a court from exercising its discretion before, during, or after trial or entry of plea."

The nine listed "mitigating circumstances" include factors such as mental illness, prior victimization, childhood trauma, use of an inoperable or unloaded firearm, the defendant's status as a juvenile, and the use of a prior conviction that is over five years old. (§ 1385, subd. (c)(2)(A)-(I).) They also include the following two mitigating circumstances of relevance to this appeal: "(B) Multiple enhancements are alleged in a single case. *In this instance, all enhancements beyond a single enhancement shall be dismissed.* [¶] (C) The application of the enhancement could result in a sentence of over 20 years. *In this instance, the enhancement shall be dismissed.*" (§ 1385, subd. (c)(2), italics added.)

14

Medina argues that because the 25-to-life firearm enhancements resulted in a sentence of over 20 years, they *must* be dismissed under section 1385, subdivision (c)(2)(C). She contends that the trial court lacked any discretion to impose these enhancements because the "shall be dismissed" language of subdivision (c)(2)(C) made dismissal mandatory.

Other California courts have consistently rejected this mandatory dismissal argument in construing the "shall be dismissed" language of subdivisions (c)(2)(B) and (c)(2)(C). (See *People v. Mendoza* (Feb. 10, 2023, E078534) ___ Cal.App.5th ___, ___ [2023 WL 1878568, at *3–*6]; *People v. Anderson* (Feb. 7, 2023, B320627) ___ Cal.App.5th ___, ___ [2023 WL 1790118, at *3–*5]; *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 15–21; *Walker*, *supra*, 86 Cal.App.5th at pp. 391, 395–398.)

We find the reasoning of these cases to be persuasive. The statutory words "shall be dismissed" cannot be read in isolation. Construed as a whole, the statute makes clear that the listed mitigating circumstances merely guide the court's discretion in determining whether a dismissal is in furtherance of justice. Subdivision (c)(1) first sets forth the governing "furtherance of justice" standard for dismissal, then subdivision (c)(2) states that the court must consider the listed mitigating circumstances "[i]n exercising its discretion" whether to dismiss. Subdivision (c)(2) further states that dismissal is not required if the court finds that it would "endanger public safety." Subdivision (c)(3) confirms the discretionary nature of this decision by stating that the court "may exercise its discretion at sentencing" but is not prevented "from exercising its discretion" earlier in the proceedings. Consistent with the holdings of our sister courts, we therefore conclude that the "shall be dismissed" language of subdivision (c)(2)(C)—read in the context of the statute as a whole—applies only after a court has exercised its

discretion in determining that a dismissal is "in the furtherance of justice" and would not "endanger public safety." (§ 1385, subds. (c)(1), (c)(2).)

Medina's contrary interpretation would mean that a 25-to-life firearm enhancement could *never* be imposed. By her reasoning, dismissal of the enhancement would be mandatory in every case because the resulting sentence would always exceed 20 years. This interpretation would effectively nullify section 12022.53, subdivision (d), which mandates "an additional and consecutive term of imprisonment in the state prison for 25 years to life" for personal and intentional discharge of a firearm proximately causing great bodily injury or death in the commission of specified felonies. Such implied repeals "are strongly disfavored." (*People v. Superior Court* (*Ortiz*) (2022) 81 Cal.App.5th 851, 883.) "Absent an express declaration of legislative intent, we will find an implied repeal 'only when there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are "irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation." ' " (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 477.) Here, there is a rational basis for harmonizing the statutes—by following the decisions of other California courts and holding that the "shall be dismissed" language of subdivisions (c)(2)(B) and (c)(2)(C) applies only if the trial court in the exercise of its discretion finds that dismissal is in furtherance of justice and would not endanger public safety.

On appeal, Medina does not assert that the trial court abused its discretion by impliedly determining that dismissal of these enhancements was not in the furtherance of justice or would endanger public safety. Her sole argument is that dismissal of the firearm enhancements was mandatory.

Because we reject her sole claim of error, we affirm the trial court's imposition of the 25-to-life firearm enhancements.[2]

## DISPOSITION

The judgment is affirmed.

BUCHANAN, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.

---

[2] We also note that it is questionable whether this mitigating circumstance even applies here. Medina was sentenced to seven years to life for the premeditated attempted murder. It was arguably the life sentence and not the firearm enhancements that "result[ed] in a sentence of over 20 years . . . ." (§ 1385, subd. (c)(2)(C).) One treatise has suggested: "There will be no entitlement to relief unless it is the application of the term for the enhancement that results in a sentence of longer than 20 years. Accordingly, the right to relief under this provision will not be available to defendant's [*sic*] sentenced under the Indeterminate Sentencing Law (ISL). It is the function of the sentence on the base term that results in the life sentence, not the enhancement." (Couzens et al., Sentencing California Crimes (The Rutter Group 2022) § 12:11, p. 746.) We need not decide this question, however, because we reject Medina's argument for the other reasons we have explained.

17