Filed 1/21/25  P. v. Thomas CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DONALD DUANE THOMAS,<br><br>Defendant and Appellant. | B330465<br><br>(Los Angeles County<br>Super. Ct. No. BA497310) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gustavo N. Sztraicher, Judge.  Affirmed.

Nicholas Seymour, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jonathan M. Krauss and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Donald Duane Thomas fatally stabbed his neighbor Jorge Veliz-Velasquez during an altercation. A jury rejected appellant's heat of passion and self-defense theories and found him guilty of second degree murder. Appellant contends the court misstated the law and violated his constitutional right to adequate instructions by failing to instruct the jury with bracketed language in CALCRIM No. 3472, which provides that a defendant who provokes a fight using non-deadly force has the right to defend himself or herself with deadly force if the opponent suddenly responds with deadly force. Appellant also contends his trial counsel was ineffective for failing to request the bracketed language. We affirm.

## PROCEDURAL HISTORY

An information filed in June 2022 charged appellant with the July 2021 murder of Veliz-Velasquez (Pen. Code, § 187, subd. (a)).[1] The information further alleged that appellant suffered prior strike convictions for robbery (§ 211) in 1967 and 1983 (§§ 667, subds. (b)-(j), 1170.12). Appellant proceeded to jury trial in March and April 2023. The jury found him guilty of second degree murder on April 13, 2023 and found the strike allegations true after a bifurcated trial.

The trial court granted appellant's motion to strike his strike convictions in the interests of justice pursuant to section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. It sentenced appellant to a term of 15 years to life. Appellant timely appealed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## FACTUAL BACKGROUND

### I.      Prosecution Evidence

In July 2021, appellant lived in his Jeep, which he parked on the street near the St. Andrews Place Recreation Area in Los Angeles.  Veliz-Velasquez and his partner, Fatima Garmendia, lived in an RV parked behind appellant's Jeep.  Minor Daniel C. and his mother lived in an RV parked in front of appellant's Jeep.  The neighbors were friendly with one another; Garmendia provided appellant with power from her RV and watched his belongings when he was away.

Garmendia and Daniel C., who was 14 at the time of trial, both testified that on July 25, 2021, a man named Danny walked by the parked vehicles.  Garmendia testified that Danny used to live in the area and frequently came by for food. She added that Danny was "a little crazy" and "would always be yelling throughout the streets."  Daniel C. also testified that Danny "would walk every day in front of the RV's" and "was always yelling and asking for his money."

Daniel C. testified that as Danny walked by, yelling, appellant got up and asked Danny why he was yelling at appellant.  Garmendia told appellant that Danny was not yelling at him.  Both Daniel C. and Garmendia testified that appellant "wanted to" fight or attack Danny, and proceeded to push Danny and chase him into the street.  Daniel C. and Garmendia testified that Garmendia yelled at appellant to stop; Daniel C. added that Garmendia grabbed appellant.  They both testified that appellant stopped going after Danny and approached Garmendia, looking "very upset,"  "angry," and "furious."

According to both Garmendia and Daniel C., appellant and Garmendia then began yelling at one another. Around that time, Veliz-Velasquez arrived at the scene in his Cadillac. Veliz-Velasquez told appellant not to yell at Garmendia and stood between her and appellant. Appellant began yelling at Veliz-Velasquez. Garmendia and Daniel C. gave slightly different testimony about what happened next.

According to Garmendia, Veliz-Velasquez pushed appellant once with both hands, knocking him to the ground. While he was on the ground, appellant told Veliz-Velasquez, "You're going to pay for it." Garmendia told Veliz-Velasquez to run; he did, and appellant chased him. Appellant pushed Veliz-Velasquez against a fence surrounding a nearby basketball court. A man on the court who was wearing a yellow shirt came over and told appellant to stop fighting with Veliz-Velasquez. At some point thereafter, appellant reached his arm toward Veliz-Velasquez's chest and stabbed him with a small knife  Veliz-Velasquez said he was going to go grab a bat, and went to his RV to do so. Veliz-Velasquez held the bat in his hands but did not use it. At some or all points during the chase and ensuing altercation with appellant, Veliz-Velasquez was holding a small dog or puppy.

Daniel C. initially testified that Veliz-Velasquez got upset, grabbed a bat from his RV, and told appellant he would fight him with the bat if appellant did not leave. Veliz-Velasquez did not strike appellant with the bat, however; he "threw the bat in front of his RV" while he and appellant verbally sparred. Later in his direct examination, after viewing surveillance video of the incident that was admitted into evidence,[2] Daniel C. testified

---

[2]     Los Angeles Police Department (LAPD) officer Thorsten Timmermans testified that he retrieved surveillance video from

4

that he did not see Veliz-Velasquez with the bat until later in the altercation, after appellant had stabbed Veliz-Velasquez.

Daniel C. testified that Veliz-Velasquez was holding a little dog or puppy while he and appellant yelled at one another. Appellant then walked to the basketball court, where he talked to a man wearing a yellow shirt. Garmendia and Veliz-Velasquez were nearby, and Veliz-Velasquez was still holding the puppy and yelling at appellant. After Veliz-Velasquez told appellant to stay away from him and Garmendia, appellant "attacked" Veliz-Velasquez, punching him in the face with a closed fist and stabbing him in the chest with a "pocketknife." Daniel C. saw appellant stab Veliz-Velasquez twice. Veliz-Velasquez dropped the puppy and ran back toward the RVs, where Daniel C. saw him with a bat. He fell to the ground in front of Daniel C.'s RV.

LAPD officer Nelson Portillo testified that he was the first officer to arrive on the scene. Appellant approached Portillo, handed him a knife, and said, "I stuck him." Portillo took appellant into custody. Another officer retrieved the bat over Garmendia's objections, and bodycam footage recorded Garmendia saying, "he brought it to save . . . because he was having the knife." Garmendia continued, "Look as soon as he get that for save his self [*sic*] he came with the knife and cut him. … We didn't have no chance to hit him." LAPD detective Gabriela Saucedo wrote in her notes that Garmendia told her Veliz-

_____

two cameras at St. Andrews park. The surveillance video was at least 12 minutes long and captured appellant's encounters with both Danny and Veliz-Velasquez, albeit without audio and from some distance away. Defense counsel stated during closing that "we can all agree that what's on the video is what actually happened."

Velasquez "retrieved a bat and threatened, 'I'm going to beat your ass.'" The next note Saucedo wrote stated, "The suspect removed the knife from pocket and stabbed victim in the torso, front." Saucedo testified that the notes were not sequential.

Later testing of the knife, a pocketknife with no spring-action, revealed blood on the blade that matched Veliz-Velasquez's DNA profile. DNA retrieved from the knife's handle matched both appellant and Veliz-Velasquez. Testing of bloodstains on the bat matched only Veliz-Velasquez's DNA. The medical examiner who performed the autopsy of Veliz-Velasquez testified that Veliz-Velasquez suffered a superficial "incise" or "slashing" wound to the neck and two "stab" or "thrusting" wounds to the chest. One of the stab wounds was five inches deep and lacerated Veliz-Velasquez's heart; the other was four inches deep and pierced his right lung. Both were fatal.

## II.    Defense Evidence

On July 25, 2021, Arte Miura was driving toward the St. Andrews Recreation Center when he saw an altercation between two men (appellant and Danny). Miura identified appellant as one of the men and said appellant was being "back[ed] out to the street" and "started defending himself back." Another man (Veliz-Velasquez) pulled up in a Cadillac, and Miura thought it "looked like he was going to jump in." On cross-examination, after viewing video of his interview with police, Miura stated that the man in the Cadillac did not show up until after the fight had concluded. He further testified that he did not see that man "get physical" or "fight" appellant, though he "had a look on his face."

Percipient witness Agent Alexander testified that he was playing basketball at St. Andrews Park on July 25, 2021. He was wearing a yellow shirt. He heard "loud noise back and forth" and

6

saw two people, an older man and a younger man, "altercating" and "fighting" for "maybe 10 minutes." He initially said the people were "wrestling," but after viewing surveillance video testified that there was no physical fighting, only people "being loud." At some point, appellant approached Alexander at the fence. Appellant was repeatedly yelling things like, "Leave me alone. Stop effing with me. Leave me alone." and "Get away from me." Appellant then threw a punch at Veliz-Velasquez. Alexander did not see a knife in appellant's hand at any point.

Darrell Prins was also playing basketball at St. Andrews Park on July 25, 2021. He "saw parts of the altercation" and went to see what was going on after the stabbing. He did not see anyone flee the scene.

The defense played a police bodycam recording of an interaction between a police officer at the scene and an unidentified witness. During the conversation, the officer asked the witness if he had seen what happened, and the witness responded, "Yeah [unintelligible] … he got hit by a bat and all that." When the officer asked "Somebody hit him with a bat?," without clarifying or describing "him," the witness gave an unintelligible reply. The officer then asked if the witness knew "who pushed him down and who hit him with a bat," and the witness said, "I guess That [*sic*] dude right there," without clarification. The officer asked if "they were fighting," again without clarifying who "they" was, and the witness responded, "Pretty much, yeah."

Garmendia's brother, Nelson Magana, testified that Garmendia had called him on "several occasions" to report domestic violence between herself and Veliz-Velasquez. On one

7

occasion, in July 2015, Magana called the police because Garmendia said Veliz-Velasquez had "pulled a knife on her."

Appellant also testified on his own behalf. On July 25, 2021, appellant heard a "bad talker" who walked by "all the time." Appellant asked the man why he was doing this, and "he kept pulling back away from me." Appellant kept asking the man questions as the man backed into the street. The man then pulled out a knife, so appellant pulled his own knife from his pocket. Appellant kept his knife in his hand as the man walked away.

Appellant, who had about $3,000 or $4,000 in cash in his pocket, then went over to talk to Garmendia. He had planned to give Garmendia some of the money, but she was "put off" by appellant's interaction with the man. Before appellant had a chance to say much to Garmendia, Veliz-Velasquez arrived in his Cadillac. Garmendia ran up to Veliz-Velasquez and said something to him about appellant's encounter with the man. She then told appellant to "stand right here" next to her, and he responded, "You talkin' to me like you would a dog."

Veliz-Velasquez then "did a whole lot of cursing" and chided appellant for "disrespecting" Garmendia. Appellant said he had not disrespected anyone and started backing away. Veliz-Velasquez, Garmendia, and a third person continued to advance toward him. Veliz-Velasquez somehow knocked appellant out, and he fell to the ground and soiled himself. He managed to keep hold of his knife in his hand, however, while someone held him down and Veliz-Velasquez kneed and kicked him in the side of the head. Appellant repeatedly reiterated that he had his knife out the whole time, after drawing it during the altercation with the other man.

At some point, Veliz-Velasquez and the others stole appellant's money from him, and Veliz-Velasquez told him, "I'm going to kill you." Appellant "was scared" and "cut the man" one time. Appellant believed he had cut Veliz-Velasquez in the arm and testified that he "reacted" and did not "intend to do the damage to that man." Veliz-Velasquez went to his RV and got a bat at some point; appellant gave inconsistent testimony about whether it happened before the stabbing or after Veliz-Velasquez was bleeding.

## DISCUSSION

### I.  Background

The prosecution requested that the trial court instruct the jury with three pattern instructions on self-defense: CALCRIM Nos. 3471, 3472, and 3474.[3] The parties submitted on CALCRIM No. 3471, Right to Self-Defense: Mutual Combat or Initial Aggressor. The court gave that instruction, which as given provided:

"A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

1. He actually and in good faith tried to stop fighting;
AND

2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;
AND

---

[3]  At defense counsel's request, the court also gave pattern instructions on the lesser included offense of voluntary manslaughter due to heat of passion (CALCRIM No. 570) and imperfect self-defense (CALCRIM No. 571).

9

3. He gave his opponent a chance to stop fighting.

If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting.

A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

Defense counsel objected to CALCRIM No. 3474, Danger No Longer Exists or Attacker Disabled, arguing that "there's evidence of continuous course of conduct" such that "the threat was omnipresent." The trial court overruled the objection and gave the instruction, which as given provided, "The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends."

Defense counsel also objected to CALCRIM No. 3472, Right to Self-Defense: May Not Be Contrived, which the prosecution apparently proffered without the bracketed language at issue in this case. Defense counsel asserted the instruction was unwarranted because there was no "evidence that a fight was provoked with intent to create an excuse to use force." He contended, "I think that this is an organic, spur-of-the-moment

10

fight. I don't think that there was any evidence of a motive to induce a fight and then respond with deadly force." The prosecution responded that the surveillance video showed appellant following Veliz-Velasquez as the latter kept moving away.

The court found that the instruction was supported and gave the following first sentence of the instruction: "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." There was no discussion of, and the court did not give, the following bracketed language in CALCRIM No. 3472: "However, if the defendant used non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting." Notably, this language was included, verbatim, in CALCRIM No. 3471.

During closing argument, which occurred after the jury was instructed, the prosecution argued that the evidence did not support a finding that appellant acted in self-defense. Referring to language from the voluntary manslaughter instructions, the prosecution argued it was unreasonable for appellant to believe he was in imminent danger because the surveillance video showed appellant approaching Veliz-Velasquez, following him around, and turning his back to Veliz-Velasquez while appellant was talking with Alexander at the basketball court. The prosecution added, "You cannot use self-defense in mutual combat. You cannot set up your own self-defense claim. You cannot be the initial aggressor for self-defense. And you cannot claim self-defense if the threat or the danger has already ended."

11

Defense counsel argued that there was conflicting evidence as to when Veliz-Velasquez got the bat and appellant drew the knife, and urged the jury to find that appellant did not draw the knife until after Veliz-Velasquez got the bat. He also contended that appellant was provoked and reacted with passion in response to seeing the bat. Defense counsel asserted that appellant was much older than Veliz-Velasquez, and thus had no other option but to draw his knife when he saw Veliz-Velasquez with the bat. He further argued, "if the defendant uses non-deadly force and the opponent responds with deadly force, the defendant has the right to defend himself with – so in this narrative, if Donald was following Mr. Veliz, Mr. Veliz responds to what was originally a fistfight and pulls out the big guns with the bat, that immediately makes deadly force appropriate in response because in this story Mr. Veliz is ratcheting up the intensity from what would just be mutual combat, fist to fist, to something where deadly force is absolutely necessary."

## II.    Analysis

Relying on *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*) appellant contends that CALCRIM No. 3472, as given, misstated the law and violated his constitutional rights to jury trial, a complete defense, and adequate instructions on his theory of the defense. Correctly anticipating respondent Attorney General's forfeiture argument, appellant asserts that his counsel either preserved these arguments by objecting to CALCRIM No. 3472 as a whole, or rendered ineffective assistance by failing to expressly request that the court instruct the jury with the bracketed language in CALCRIM No. 3472. He alternatively contends that we can and should reach his arguments because the trial court violated its sua sponte duty to correctly instruct

12

the jury and the omission of the bracketed language affected his substantial rights.  (See § 1259.)

The general rule is that "'[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 901; see also *People v. Jennings* (2010) 50 Cal.4th 616, 671.)  Appellant contends CALCRIM No. 3472 as given was legally incorrect, but the Supreme Court has held that the similarly worded CALJIC No. 5.55[4] correctly states the law.  (*People v. Enraca, supra,* 53 Cal.4th at pp. 760-761.)  Division Five of this district also has held that CALCRIM No. 3472 as given "is a correct statement of law" in all but "the very rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force."  (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334.)  Appellant asserts that this case is one such rare case because it is on all fours with *Ramirez, supra,* 233 Cal.App.4th 940.  We disagree.

In *Ramirez,* there was evidence that the defendants confronted rival gang members intending to start a fight, but not to shoot or kill anyone.  (*Ramirez, supra,* 233 Cal.App.4th at p. 944.)  One of the defendants, Armando, testified that after a fistfight broke out, one of the rival gang members, Rivera, appeared to be holding an object that looked like a gun.  Armando then pulled his own gun from his sweatshirt pocket and fatally

---

[4]     "The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense."  (CALJIC No. 5.55; *People v. Enraca*  (2012) 53 Cal.4th 735, 761.)

shot Rivera. (*Id.* at p. 945.) The defense argued that because Armando's group started the fight intending to use only non-deadly force, and Rivera responded with sudden and deadly force, Armando had a right to use deadly force in self-defense. (See *id.* at p. 948.) The prosecutor, relying on the current first sentence (and then-entirety) of CALCRIM No. 3472, repeatedly argued in rebuttal that Armando had no right to claim self-defense because he instigated the fight. (See *id.* at pp. 948-949.) The jury found Armando guilty of first degree murder and circled CALCRIM No. 3472 in the instructions. (*Id.* at pp. 943, 947.)

On appeal, Armando argued that CALCRIM No. 3472 "erroneously directed the jury to conclude a person has *no* right to self-defense against an adversary's deadly attack, even if the defendant contrived to provoke a confrontation to use only nondeadly force against the adversary." (*Ramirez*, *supra*, 233 Cal.App.4th at p. 945, emphasis in original.) A divided panel of the court of appeal concluded that although "CALCRIM No. 3472 states a correct rule of law in appropriate circumstances," including where a defendant contrives a deadly assault or attempts to claim self-defense against a victim's lawful resistance, "under the facts before the jury [it] did not accurately state governing law." (*Id.* at p. 947.) The court explained that "the instructions and the prosecutor's argument erroneously required the jury to conclude that in contriving to use force, even to provoke only a fistfight, defendants entirely forfeited any right to self-defense."[5] (*Id.* at p. 953.)

---

[5] The dissent disagreed, arguing that CALCRIM No. 3472 by its plain terms applies only "to a subset of individuals who not only instigate a fight, but do with the specific intent that they contrive the necessity for their acting thereafter in 'self-defense,'

We find *Ramirez* to be distinguishable.  In contrast to *Ramirez*, the prosecution argued self-defense did not apply because appellant was not in imminent danger, not as a matter of law because appellant started the quarrel.  This accordingly is not the "rare case" in which CALCRIM No. 3472 is legally incorrect, and appellant therefore failed to preserve the issue for appeal. Moreover, even if any of the prosecution's arguments could be construed to suggest that appellant had no right of self-defense if he contrived to use only non-deadly force, appellant did not object and has therefore forfeited any claim that the prosecutor misstated the law.  (*People v. Centeno* (2014) 60 Cal.4th 659, 674.)

Even if we were to assume the court erred by giving CALCRIM No. 3472 without the bracketed language or other modification, we would find the error to be harmless under any standard.  (See *People v. Quach* (2004) 116 Cal.App.4th 294, 303 [applying harmless-beyond-a-reasonable-doubt test of *Chapman v. California* (1967) 386 U.S. 18 where court gave erroneous self-defense instruction]; *People v. Sojka* (2011) 196 Cal.App.4th 733, 738 ["error arising from the failure to instruct on a defense to a charge is most commonly analyzed under the test articulated in *People v. Watson* (1956) 46 Cal.2d 818 [ ]"].)  Under the more stringent *Chapman* standard, we must reverse the conviction

---

and thus justify further violent actions." (*Ramirez, supra,* 233 Cal.App.4th at p. 954 (dis. opn. of Fybel, J.).)  "Hence, if the initial aggressor simply provokes a fight using nondeadly force—without an intent to create a larger conflict for the purpose of covering for him or her to engage in further violence in the name of self-defense—he or she is not precluded from claiming self-defense or imperfect self-defense in responding to the adversary's response of deadly force." (*Id.* at p. 955.)

unless we conclude "that no 'rational juror who made the findings reflected in the verdict and heard the evidence at trial court could have had a reasonable doubt regarding the findings necessary to convict the defendant [absent the instructional error].'" (*People v. Schuller* (2023) 15 Cal.5th 237, 244.)  That standard is satisfied here.

In CALCRIM No. 3471, the jury was instructed, largely verbatim, with the language appellant contends was improperly omitted from CALCRIM No. 3472.  Defense counsel also argued, without objection, that "if the defendant uses non-deadly force and the opponent responds with deadly force, the defendant has the right to defend himself," and deadly force was "absolutely necessary" because Veliz-Velasquez "ratchet[ed] up the intensity from what would just be mutual combat, fist to fist."  The jury accordingly had before it the correct principles, both in the instructions and in counsel's argument.  (See *People v. Covarrubias*, *supra*, 1 Cal.5th at p. 919 [finding error harmless where "other instructions adequately conveyed the requirement"].)  Appellant contends "the exact same factual scenario was present in *Ramirez*," but here the prosecution did not misconstrue the instructions or undermine the legal underpinnings of the defense argument.

Moreover, the evidence of appellant's guilt was overwhelming.  Surveillance video of the encounter showed that appellant pursued Veliz-Velasquez, who was unarmed and possibly holding a puppy when he was fatally stabbed.  The bat was stained with Veliz-Velasquez's own blood, and not appellant's, indicating he wielded it only after being injured.  To the extent Veliz-Velasquez may have had the bat prior to being stabbed, testimony established that he dropped it and did not use

16

it against appellant. Contrary to appellant's assertion that "there was no evidence that appellant intended to provoke a deadly confrontation at the time that it began," appellant himself repeatedly testified that he had his knife in his hand for the duration of the confrontation. The evidence did not support a finding that Veliz-Velasquez escalated the conflict such that appellant was justified in responding with deadly force.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, ACTING P. J.

We concur:


MORI, J.


ZUKIN, J.

17