Filed 3/25/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARVIN JOSEPH CHANG,<br><br>    Defendant and Appellant. | F088521<br><br>(Super. Ct. No. VCF409217)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary, Lewis A. Martinez, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Marvin Joseph Chang was convicted in July 2024 of a litany of charges stemming from a police chase and gun battle with officers outside of Three Rivers. Defendant suffered from delusions that he was being pursued by CIA agents who intended to harm or kill him. The sole issue on appeal here is whether the trial court should have provided an instruction on imperfect self-defense during the guilt phase of the trial to permit defendant to argue that his belief in the necessity of self-defense was honest, if not reasonable. The court denied this instruction, citing *People v. Elmore* (2014) 59 Cal.4th 121 (*Elmore*). *Elmore* stands for the proposition that imperfect self-defense may not be invoked by one who is operating entirely under the influence of a delusion, without an "objective correlate." (*Id.* at pp. 136–137.) We find the mere presence of a peace officer cannot be such an objective correlate. The objective correlate must at least conceivably relate to a reasonable need for self-defense. Imperfect self-defense is a species of mistake of fact, where a person may hold the actual, if unreasonable, belief that self-defense is necessary. A pure delusion is not a mistake of fact; rather, it is "perception of facts not grounded in reality." (*People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1453, fn. omitted (*Mejia-Lenares*).) Defendant's belief that all peace officers were working on behalf of the CIA to kill him is clearly a delusion, not just a mistake of fact.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 19, 2021, E.M. was at a gas station in Three Rivers, searching for her purse while seated in her car. She heard a knock on the window and saw a gun pointed at her. A man asked for her purse, but having not turned off the car, she drove away instead of giving it to him. E.M. stopped her car approximately a block away and called 911. While waiting for assistance to arrive, she heard gunshots. Additionally, Megan T., who worked nearby, also heard gunshots around this time.

A 911 dispatch went out reporting that shots were fired at the gas station in Three Rivers and directing officers to be on the lookout for a white Prius, driven by a man dressed in gray. Officers Crass and Wallace heard the call and decided to respond, knowing that the only road out of Three Rivers would take someone past their current position. The officers, who worked for CalFire, were wearing peace officer uniforms, but were in a CalFire truck. They spotted defendant, wearing a gray sweatshirt, driving a white Prius westbound away from Three Rivers. The officers turned to follow defendant and engaged their lights and sirens to pull him over. Defendant displayed a firearm out of the window of the car while the officers were behind him.

A short while later, defendant stopped suddenly on the highway, partially turning his car in the middle of the highway. He then opened the car door and immediately began firing at Officers Crass and Wallace. The officers had no opportunity to give defendant commands of any kind, because he started firing before they even left their vehicle. The officers returned fire. Defendant then sped away, and the officers resumed their pursuit of him. Other deputies joined in the pursuit, as defendant continued to fire shots out of the car's window. The Prius and pursuing vehicles exceeded speeds of 95 miles per hour during the chase. Defendant ran several other vehicles, including a UPS truck, off the road while fleeing down the highway. Additional officers, including Officer Wilson of the California Highway Patrol, joined in the pursuit.

Meanwhile, ahead of the convoy, another deputy was deploying spike strips across some of the lanes of traffic. As defendant reached that deputy, he veered to the other side of the freeway and turned onto another road while firing at the deputy from his car. As the various officers continued their pursuit on this other road, smoke began billowing out from the Prius, at which point defendant drove the car into an orchard and stopped. After the car came to a stop, defendant fled on foot. Most of the officers set up a perimeter around the orchard to prevent him from leaving.

Officer Wilson proceeded into the orchard to check the Prius and attempted to locate defendant, ultimately parking her vehicle behind defendant's. After she climbed out of her vehicle, defendant began firing at Wilson from the trees, and she retreated behind her vehicle and returned fire. When Wilson went to reload her gun, the magazine did not seat correctly and fell out of the gun and onto the ground, at which point defendant ran towards her, continuing to shoot. Wilson attempted to move around the vehicle, but was shot in the shoulder, breaking her collarbone. After being shot, and while running away from defendant, Wilson slipped and fell to the ground, which allowed defendant to catch up with her. Wilson testified that, at that moment, she was "anticipating getting shot in the back of the head." Defendant did not shoot Wilson again, but began striking her with a hard object, presumably the handgun he was holding. Another officer spotted defendant and Wilson fighting and fired several shots, which caused defendant to flee.

Several remaining officers pursued defendant as he fled the scene where he had assaulted Officer Wilson. He was spotted by Officer Wallace, who shouted to alert the other officers as to defendant's location. When defendant heard the shouting, he turned toward Wallace and, believing he might be fired upon next, Wallace shot defendant in the leg with a shotgun slug. Following this, defendant was handcuffed and arrested.

Officers found a nine-millimeter firearm with an extended, 30-round magazine and a live round jammed in the chamber, lying next to defendant. Defendant was also wearing body armor under his sweatshirt. Additionally, when officers searched defendant's car, they located an assault rifle with an extended, 50-round magazine, a machete, a pan with mushrooms in it, copious amounts of ammunition for both the rifle and the pistol, several extra magazines, and marijuana. The assault rifle was behind the driver's seat, wrapped in a blanket. The mushrooms were hallucinogenic. Although defendant's toxicology screen did not detect any psilocybin or THC—the active ingredients in hallucinogenic mushrooms and marijuana, respectively—the evidence

4.

indicated the metabolites of psilocybin are very unstable and are removed from the body very quickly and, therefore, the test could not rule out the use of mushrooms.

Defendant testified in his own defense. He stated he normally lived in Los Angeles with his mother. Although he had moved out some months prior, he returned to the house a few days before the incident to leave his mother a note[1] and "grab some … camping gear and things to survive in the wilderness." Defendant had decided to "live inside the national park," because he was scared "[o]f the government and CIA trying to silence [him]." He said he first noticed "a white pickup truck following [him] on the 10 freeway by the Rosemead exit," which he believed was the CIA. He also claimed a helicopter was following him through several different cities in Southern California. Defendant testified that on the night before he left, the CIA was "driving by and discharging their firearms," which scared him because they were "not being as subtle" as they had been, and he believed they were "trying to scare [him] on purpose." The next day, he packed his two dogs in the car, destroyed his laptop and cell phone,[2] and left for Yosemite with a compass and a map. However, he "kept getting lost," so he decided to go to Sequoia National Park "because it was closer on the map." Defendant was a convicted felon who had previously served a prison term following a conviction for assault with a deadly weapon in 2008. Defendant testified that, because he was a convicted felon, he had to obtain the guns he had illegally. He had also illegally obtained a ballistic vest. Defendant stated he obtained these items because he was "gearing up for

---

[1] The note read: "Dear mom. The establishment is trying to silence me. I must hide. I love you. Vegan anarchy spiritual."

[2] According to defendant, he destroyed his cell phone and computer because he "didn't want the NSA to watch [him] and tell the CIA where [he] was going." He also testified, "[T]hey could listen to you through your phone and your laptop." When asked who "they" were, defendant replied, "The CIA, the NSA, the Illuminati, the New World Order, the people who control the world."

a revolution." According to defendant, he knew that his political activities could result in his being monitored by the government.

Defendant was arrested by police in Sierra Madre on January 31, 2021—approximately three weeks before the incident underlying this case—for possession of a firearm, mushrooms, and a knife. He knew it was illegal for him to possess a firearm at that time, and that he could go back to prison for doing so. He also testified he was afraid of the CIA and FBI then as well; however, he did not fire at any of those officers and complied with the arrest without fleeing, even though he was "high on mushrooms."

Shortly before leaving Southern California for Sequoia, defendant posted a profanity-laden video to his Instagram account mocking and taunting the CIA, the NSA, and the FBI. He then left for a national park, where he intended to "eat the grass and … forage for food." He thought the CIA would be easier to avoid in the mountains because it was "mostly wilderness." Defendant testified he "was trying to wait a few years in the wilderness first and then try to sneak my way back" to Southern California after he had "let the heat die down."

On the day of the incident, defendant testified that E.M. pulled into the gas station after he was there, and he believed she was with the CIA. He tapped on her window with the gun and told her to leave, which she did. He then poured gas all over the gas station and told "[t]he bug that I thought was in my car," "If you guys don't back up, I'm gonna burn us all, and I'll meditate to escape the pain." Because E.M. drove away, he did not light the gas station on fire. He then "fired two shots in the air … [t]o let them know that [he] was armed," before driving away. Defendant testified he had decided to head back to Los Angeles, because the CIA had found him in Sequoia National Park.

Defendant testified he shot at the police when they tried to pull him over because he thought the CIA was "after [him]" and "was trying to kill [him]" or "silence [him]." He stated he did not intend to kill the officers he was shooting at but instead was "trying to get away" because he was "scared." Defendant testified he thought the officers would

"either kill [him] or take [him] to Guantanamo Bay … [a]s a political prisoner," because he was a "lightworker," which he explained meant that he "fight[s] the forces of evil." According to defendant, he was in fear for his life when he "first saw those [CalFire] officers that tried to stop [him]," because he thought "they were police that was called in by the CIA." Defendant admitted that he fired at the officers first. Defendant claimed he did not intend to kill the officers, who he believed wore bulletproof vests. He thought they would merely be injured but did acknowledge he was "willing to injure or kill to escape to save [his] life." Defendant also acknowledged firing his weapon from the vehicle, although he was unsure who he was firing at.

Recalling the assault in the orchard, defendant said he shot Officer Wilson in the shoulder because, when he went up to her and told her to stop shooting, she continued trying to reload her gun, but he did not want to kill her. Defendant explained that if he wanted to kill her, he would have shot her in the head, which he could have done. According to defendant, while he had both a nine-millimeter and an assault rifle, he fired only the pistol because "the police, they wear level IIIA bulletproof vests, and that's designed to only protect them up to .44 Magnum, so the AR-15 would penetrate that vest. I didn't want to kill anyone so I didn't take out my AR-15."

Following his arrest, defendant was diagnosed with a schizoaffective disorder with bipolar type with delusional ideation. The jury was told by expert witnesses that government-related delusions are common, and that defendant's delusions presented as genuine. According to the evaluating doctors, a person's delusions could be perceived as a real threat and might cause the individual to act out to avoid that threat. Defendant was ordered to be medicated by the court, although he stated he did not want to take any medication. According to defendant, the medication helped, and he no longer had thoughts about the CIA or about police officers' connections to the CIA and was no longer afraid of police officers.

Defendant was charged with 19 counts in relation to this incident, including: eight counts of attempted murder (Pen. Code, §§ 664, 187;[3] counts 1, 2, 3, 6, 8, 10, 12 & 13); two counts of assault with a firearm upon a peace officer (§ 245, subd. (d)(1); counts 7 & 9); driving against oncoming traffic during flight from a pursuing officer (Veh. Code, § 2800.4; count 4); reckless driving during flight from a pursuing officer (*id*., § 2800.2; count 11); throwing an object at an occupied vehicle with intent to inflict great bodily injury (*id*., § 23110, subd. (b); count 5); reckless discharge of a firearm (§ 246.3, subd. (a); count 14); assault with a semiautomatic firearm (§ 245, subd. (b); count 15); making a criminal threat against E.M. (§ 422, subd. (a); count 16); unlawful possession of body armor (§ 31360, subd. (a); count 17); unlawful possession of a firearm (§ 29800, subd. (a)(1); count 18); and unlawful possession of ammunition (§ 30305, subd. (a)(1); count 19). Various firearm enhancements were alleged related to the personal use and discharge of a firearm in violation of sections 12022.5 and 12022.53, as well as the existence of prior strikes, which are not recounted here as they are not relevant to this opinion.

Defendant requested an instruction based on imperfect self-defense. The trial court commented, "The problem I'm having here is that so far as I can tell, the entirety of Mr. Chang's belief in the need to respond with force in this case is dependent upon this delusion that these law enforcement officers are in cahoots with the CIA who is surveilling Mr. Chang and seeking to have Mr. Chang killed. I don't see how that can be disentangled from the sequence of events." According to the court, "[f]rom the get-go, [defendant] … is operating under this delusion that the CIA is after him. That's how it starts at the gas station. … He produces the gun and fires shots because he thinks that the CIA has followed him to Three Rivers, and once the police get involved, he automatically thinks that all of those police personnel are also working in tandem with the CIA and

---

therefore are attempting to kill him." The court further observed: "And here, there's no suggestion, for example, that the police did anything wrong throughout the course of these events. There's no hint they used any excessive force or behaved inappropriately in any way that would suggest to a reasonable person capable of assessing the facts that force was appropriate or necessary in any way." Ultimately, the court declined to give an imperfect self-defense instruction for voluntary manslaughter, because "all of the evidence here in my view establishes that any belief that [defendant] had and the need to use deadly force to defend himself was entirely dependent upon and produced by these delusions that have been testified to."

Ultimately, defendant was found guilty of counts 1 (attempted murder), 2 (attempted murder), 4 (driving against traffic), 7 (assault with a firearm), 9 (assault with a firearm), 10 (attempted murder), 11 (driving recklessly), 12 (attempted murder), 13 (attempted murder), 14 (reckless discharge of a firearm), 15 (assault with a firearm), 17 (possession of body armor), 18 (possession of a firearm), and 19 (possession of ammunition); and not guilty of counts 3 (attempted murder), 5 (throwing an object at a vehicle), 6 (attempted murder), 8 (attempted murder), and 16 (criminal threats).

On the five convictions for attempted murder, defendant was sentenced to 50 years to life on count 1 and 30 years to life on counts 2, 12, and 13, all of which were ordered to be served consecutively. Sentencing on count 10 was stayed pursuant to section 654. Additional time was imposed for some of the charged enhancements pursuant to section 12022.53, including 25 years on count 1 and 20 years on each of counts 2, 12, and 13, for a total prison term of 225 years to life. Sentencing on the remaining enhancements was stayed. Defendant also received an additional determinate sentence of 63 years eight months. A notice of appeal was timely filed.

## DISCUSSION

The sole issue on appeal in this case pertains to the trial court's refusal to instruct the jury on imperfect self-defense,[4] based on defendant's claim that he honestly, if unreasonably, believed he needed to use force to protect himself from the police, because they were affiliated with the CIA and were seeking to kill him. The doctrine of imperfect self-defense holds that, if a person kills in the good faith, but unreasonable, belief of needing to act in self-defense, " 'the belief negates what would otherwise be malice, and that person is guilty of voluntary manslaughter …, not murder.' " (*People v. Schuller* (2023) 15 Cal.5th 237, 243 (*Schuller*).) While phrased in a manner that suggests it is an affirmative defense, imperfect self-defense is " 'not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter. And voluntary manslaughter … is not a defense but a crime ….' " (*Id*. at p. 253.) Thus, a request for an instruction on imperfect self-defense is a request for an instruction on a lesser-included offense. (*Id*. at p. 252; *People v. Rios* (2000) 23 Cal.4th 450, 461.) We review de novo whether a trial court appropriately refused an instruction on a lesser included offense. (*People v. Avila* (2009) 46 Cal.4th 680, 705.) An instruction is required in this circumstance when supported by substantial evidence, which is evidence "from which a jury composed of reasonable persons could conclude 'that the lesser offense, but not the greater, was committed.' " (*Ibid*.)

In *Elmore*, our Supreme Court considered "whether the doctrine of unreasonable self-defense is available when belief in the need to defend oneself is entirely delusional." (*Elmore*, *supra*, 59 Cal.4th at p. 130.) The court concluded it is not. (*Ibid*.) After summarizing the general mens rea required for first degree murder—namely, " '[a] killing with express malice formed willfully, deliberately, and with premeditation' "—the

---

**4** Cases discussing this concept use both the phrase "imperfect self-defense" and "unreasonable self-defense." This opinion generally uses the phrase "imperfect self-defense."

10.

court noted that the lesser-included offense of voluntary manslaughter can stem from two bases: heat of passion and unreasonable self-defense. (*Id*. at p. 133.) Reasonable self-defense "is a complete justification" for a killing, "and such a killing is not a crime." (*Id*. at pp. 133–134.) A killing in self-defense that is unreasonable under the circumstances "is not justifiable. Nevertheless, 'one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter.' " (*Id*. at p. 134.) This is "most accurately characterized as an *actual* but unreasonable belief." (*Ibid*., fn. omitted.) "Whenever there is substantial evidence that the defendant killed in unreasonable self-defense, the trial court must instruct on this theory of manslaughter." (*Ibid*.)

In upholding the viability of this form of voluntary manslaughter, the Supreme Court has differentiated between the now-defunct doctrine of diminished capacity and imperfect self-defense. (*In re Christian S.* (1994) 7 Cal.4th 768, 776.) The court found more than 30 years ago that, when the Legislature eliminated the doctrine of diminished capacity, the doctrine of imperfect self-defense remained intact. (*Id*. at p. 778.) This is because, "[u]nlike diminished capacity, imperfect self-defense is not rooted in any notion of mental capacity or awareness of the need to act lawfully. To the contrary, a person may be entirely free of any mental disease, defect, or intoxication and may be fully aware of the need to act lawfully—and thus not have a diminished capacity—but actually, although unreasonably, believe in the need for self-defense." (*Id*. at pp. 777–778.) "Thus, unreasonable self-defense is not premised on considerations of mental disorder." (*Elmore*, *supra*, 59 Cal.4th at p. 136.) An argument for unreasonable self-defense " 'is based on a defendant's assertion that he lacked malice … because he acted under an unreasonable *mistake of fact*—that is, the need to defend himself against imminent peril of death or great bodily harm.' " (*Ibid*.)

Indeed, this court has previously noted imperfect self-defense is "a species of mistake of fact," and because of that, "cannot be founded on delusion." (*Mejia-Lenares*,

11.

*supra*, 135 Cal.App.4th at p. 1453.) As we explained in *Mejia-Lenares*, "[a] person acting under a delusion is not negligently interpreting actual facts; instead, he or she is out of touch with reality. That may be insanity, but it is not a mistake as to any fact." (*Id*. at pp. 1453–1454.) The Supreme Court in *Elmore* agreed with this analysis, noting that "unreasonable self-defense, as a form of mistake of fact, has no application when the defendant's actions are entirely delusional." (*Elmore*, *supra*, 59 Cal.4th at pp. 136–137.) "A defendant who makes a factual mistake misperceives the objective circumstances. A delusional defendant holds a belief that is divorced from the circumstances." (*Id*. at p. 137.)

The critical distinguishing feature which renders a delusional belief inapplicable for imperfect self-defense is the "absence of an objective correlate." (*Elmore*, *supra*, 59 Cal.4th at p. 137.) The Supreme Court offered this analogy: "A person who sees a stick and thinks it is a snake is mistaken, but that misinterpretation is not delusional. One who sees a snake where there is nothing snakelike, however, is deluded. Unreasonable self-defense was never intended to encompass reactions to threats that exist only in the defendant's mind." (*Ibid*.)

Critical to the Supreme Court's holding in *Elmore* was that, in order for an imperfect self-defense instruction to be inapplicable, the belief must be *entirely* delusional, i.e., without an objective correlate. The *Elmore* court continued to approve a prior holding which allowed an imperfect self-defense instruction where the defendant, due to "a state of tension" that left him "highly sensitive to external stimuli and abnormally fearful for his personal safety," "reacted to apparent threats more violently and unpredictably than an average person would." (*Elmore*, *supra*, 59 Cal.4th at p. 137.) Thus, where a defendant holds a belief which, " 'although skewed by mental illness, was nevertheless factually based,' " he may still avail himself of imperfect self-defense. (*Ibid*.; *Mejia-Lenares*, *supra*, 135 Cal.App.4th at p. 1449.) Only "*purely* delusional perceptions of threats to personal safety cannot be relied upon to claim unreasonable self-

12.

defense." (*Elmore*, at pp. 138–139, italics added; see *id*. at pp. 130, 135, 136.) Instead, "a belief in the need for self-defense that is purely delusional is a paradigmatic example of legal insanity." (*Id*. at p. 135.) Without any objective correlate, "[a]t a sanity trial, and only at a sanity trial, the defense can maintain that purely delusional perceptions caused the defendant to believe in the necessity of self-defense." (*Id*. at p. 146.)

Because of this, where there is substantial evidence of an objective correlate to the need for self-defense, an imperfect self-defense instruction should be given. *Schuller* is instructive on this point. In *Schuller*, the evidence tended to show the defendant was delusional, having testified that following a car accident he began experiencing "visions of his dead ancestors and a 'beautiful light,' " which led him to believe he was sent to " 'pave the way for the second coming … of Christ' and that a battle was being fought with 'Satan's army.' " (*Schuller*, *supra*, 15 Cal.5th at p. 246.) Witnesses testified the defendant appeared to be experiencing auditory and visual hallucinations. (*Ibid*.) The defendant ultimately killed the man with whom he had been staying, claiming he had "shared the light" with the victim, who turned out to be Lucifer. After the victim revealed himself as Lucifer, the defendant claimed the victim attempted to stab him (although the defendant noted he did not believe the victim actually was Lucifer at the time of the stabbing). (*Id*. at p. 247.) The defendant claimed he shot the victim in the head, which caused the victim to fall to the ground, but the victim then leaped back up and again attempted to attack the defendant, resulting in the defendant shooting the victim several more times in the head. (*Ibid*.)

The trial court in *Schuller* refused an instruction on imperfect self-defense, because it concluded the defendant's testimony "demonstrated his 'reaction [to the victim] was produced by the mental disturbance alone.' " (*Schuller*, *supra*, 15 Cal.5th at p. 249.) The Court of Appeal concluded this was error, because the shooting was not *entirely* delusional, given the testimony from the defendant that the victim was brandishing a knife toward him. (*People v. Schuller* (2021) 72 Cal.App.5th 221, 232–

233, revd. on other grounds (2023) 15 Cal.5th 237.)[5] The Court of Appeal noted that it was the province of the jury to determine "whether a defendant is credible." (*Ibid.*) "Thus, a single witness, including the defendant, can provide evidence establishing the objective circumstances necessary to support the instruction." (*Id*. at p. 233.)

Here, we discern no error in the trial court's refusal to instruct on imperfect self-defense. Prior to defendant firing upon the officers, there simply was no objective correlate to suggest defendant's life was being threatened by the police. Defendant argues that merely the pursuit by and presence of the CalFire officers who initially engaged with defendant was a sufficient objective correlate to give rise to an imperfect self-defense instruction, noting "[t]he officers were real" and "[t]he officers were really pursuing [defendant]."[6] We cannot agree. In virtually any case, there will be *something* objective that exists in the world with which a defendant is interacting. In *Elmore*, a 53-year-old woman was sitting at a bus stop when the defendant walked past her, before

---

[5]     While the Supreme Court ultimately reviewed and disapproved the Court of Appeal's opinion in *People v. Schuller*, *supra*, 72 Cal.App.5th 221 on harmless error grounds, it did not reach the issue of whether partially delusional beliefs may serve as a basis for imperfect self-defense. (*Schuller*, *supra*, 15 Cal.5th at p. 251, fn. 2.)

[6]     Defendant also suggests the officers firing their weapons at him was a sufficient objective correlate to warrant the instruction. In the right circumstances, this argument might have merit. However, as the trial court correctly instructed the jury, a defendant does not have the right to provoke a conflict by his use of deadly force to warrant his claimed self-defense. (*People v. Hinshaw* (1924) 194 Cal. 1, 26; *People v. Ramirez* (2015) 233 Cal.App.4th 940, 947 ["[W]hen a defendant contrives a 'deadly' assault [citation], there can be no incommensurate or unjustifiable response by the victim: he or she is fully entitled to use deadly force and the defendant has no right to claim self-defense against those deadly measures"]; see *People v. Enraca* (2012) 53 Cal.4th 735, 761–762.) Here, the testimony from the initial responding officers was that, as soon as defendant stopped his car, he began firing at them, before they even had the opportunity to give verbal commands. Even in defendant's narrative of the encounter, he shot at the officers first and would have been willing to kill them if needed. Thus, there can be no argument the officers shooting at defendant was the objective correlate providing the basis for imperfect self-defense. They were acting lawfully by defending themselves against an assailant who had indisputably fired at them first.

turning around to confront her.  (*Elmore*, *supra*, 59 Cal.4th at p. 130.)  The defendant "appeared to pull on something around her neck.  [The victim] raised her hands defensively, stood, and tried to walk away," at which point the defendant stabbed her with a sharpened paintbrush.  (*Ibid*.)  The defendant's testimony was confusing: He inconsistently suggested that someone had said or done something violent, although he could not identify what was said or done, or who had purportedly said or done it.  (*Id*. at p. 131.)  However, there were obviously *some* objective facts related to the defendant's actions in *Elmore*: there actually was a woman sitting at the bus stop, and she actually stood up, raised her hands, and attempted to walk away.  Yet none of these could be connected to any objective correlate *to a need for self-defense*, which is the state to which the objective facts identified must correlate.  In *Elmore*, as in this case, whatever threat purportedly existed at the beginning of the encounter was entirely within the defendant's mind.

This contrasts with the Court of Appeal's holding in *People v. Schuller*, which found an imperfect self-defense instruction was warranted because, even if under the influence of a delusion to some extent, the defendant testified the victim had tried to stab him.  (*People v. Schuller*, *supra*, 72 Cal.App.5th at pp. 235–236.)  The court concluded the "defendant's own testimony, even though uncorroborated and not otherwise credible, supported an instruction on actual but unreasonable belief in the need for self-defense." (*Id*. at p. 236.)  "Of course, the jury was free to reject defendant's self-defense testimony as unsupported or unreliable."  (*Ibid.)*  " 'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence' [citation], and a court is not permitted to concern itself with inconsistencies in the evidence [citation], rather the court must 'consider[] the evidence in the light most favorable to the defendant.' " (*Ibid*.)  However, testimony that the victim attempted to stab the defendant is an objective fact which correlates to the need for self-defense.

15.

The distinction is thus readily apparent: whatever the claimed objective correlate is, it must relate to the claimed need for self-defense. It is not sufficient to point merely to *any* objects or actions that exist in the real world. The objective correlate—whether an object or an action or some combination thereof—must directly correlate to a threat in such a way that it could plausibly translate into the need for self-defense, even if, in that particular case, a jury might judge that self-defense was not reasonably necessary. One must bear in mind that, at its core, imperfect self-defense is a species of mistake of *fact*. (*Elmore*, *supra*, 59 Cal.4th at pp. 136–137.) Thus, an unknown individual pointing a cell phone at a defendant might be sufficient in certain circumstances to lead to an imperfect self-defense instruction, even if a jury found it unreasonable under the circumstances to believe the cell phone was a weapon. It is at least plausible for a reasonable person to mistake a small, dark-colored object pointed at them for a gun in the right circumstances, and someone pointing a gun at the defendant might reasonably give rise to the need for self-defense. The same could not be said of an individual merely talking on a cell phone or holding nothing at all in his hands.

Here, the officers were merely attempting to pull over a car that a criminal suspect was driving. More importantly, the officers had not acted in any way to suggest to an objective observer that they might harm defendant before he began shooting at them. They had neither displayed weapons[7] nor issued threats before defendant opened fire. Defendant had no history with these officers that might lead a reasonable person to believe these officers meant to kill him. Indeed, while they were peace officers, they

---

[7] By this observation, we do not mean to suggest that any time an officer brandishes a weapon, a defendant could invoke an imperfect self-defense argument upon being charged for firing at the officer. Here, for instance, the officers were responding to a call of shots already having been fired, and it likely was reasonable for them to assume the individual they were pursuing might shoot at them. The fact they did not brandish any weapons here, prior to defendant shooting at them, simply solidifies our finding that there was no objective correlate here. It is not, per se, a sufficient condition to warrant such an instruction in the future.

were not even driving a police vehicle, but rather were driving a CalFire truck. Nothing has been identified to us as a fact that would objectively correlate to a plausible need for self-defense, and we cannot hold that peace officers are such an inherent threat that their mere engagement with a suspect could serve as such an objective correlate on its own. There was no objective correlate for the belief that these officers were attempting to assassinate defendant. The belief in the need for self-defense here was solely a delusion within defendant's mind based on his subjective belief that the officers were CIA agents who wanted to kill him. The trial court therefore did not err in finding there was insufficient objective correlates to warrant an imperfect self-defense instruction.

## **DISPOSITION**

Finding no error, we affirm the trial court's judgment.

DESANTOS, J.

WE CONCUR:

MEEHAN, Acting P. J.

HARRELL, J.

17.